# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
September 4, 2008 Session

## JAMES A. DELLINGER V. STATE OF TENNESSEE

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Blount County**
**No. C-14432     D. Kelly Thomas, Judge**

_____

**No. E2005-01485-SC-R11-PD - Filed January 22, 2009**

_____

We granted this appeal to decide an issue of first impression: whether a freestanding claim of actual innocence is cognizable in an initial petition for post-conviction relief under the Tennessee Post-Conviction Procedure Act, Tennessee Code Annotated sections 40-30-101 through -122. We have also chosen to discuss the petitioner's ineffective assistance of counsel claims and the burden of proof for prevailing on such claims. In 2003, the petitioner filed a petition for post-conviction relief. The post-conviction trial court denied his petition, and the Court of Criminal Appeals affirmed. The Court of Criminal Appeals held that: (1) a freestanding claim of actual innocence is not cognizable in an initial petition for post-conviction relief; (2) the post-conviction trial court applied the correct burden of proof to the petitioner's ineffective assistance of counsel claims; and (3) the petitioner was not denied the effective assistance of counsel. We hold that a claim of actual innocence based on new scientific evidence is cognizable in an initial petition for post-conviction relief. We affirm the Court of Criminal Appeals' denial of relief, however, because the petitioner has not met his burden of proof to support such claim. We also hold that the post-conviction trial court applied the correct burden of proof to the petitioner's ineffective assistance of counsel claims. To provide clarity in the law, however, we concurrently amend Tennessee Supreme Court Rule 28 section 8(D)(1). Finally, we hold that the petitioner was not denied the effective assistance of counsel. We affirm the judgment of the Court of Criminal Appeals in all other respects.

**Tenn. R. App. P. 11 Appeal by Permission;**
**Judgment of the Court of Criminal Appeals Reversed in Part and Affirmed in Part**

JANICE M. HOLDER, C.J., delivered the opinion of the court, in which WILLIAM M. BARKER, CORNELIA A. CLARK, GARY R. WADE, and WILLIAM C. KOCH, JR., JJ., joined.

Catherine Y. Brockenborough, Donald E. Dawson, and Sara Willingham, Nashville, Tennessee, for the appellant, James A. Dellinger.

Robert E. Cooper, Attorney General & Reporter; Michael E. Moore, Solicitor General; Mark E. Davidson, Assistant Attorney General; Jennifer L. Smith, Associate Deputy Attorney General; Michael L. Flynn, District Attorney General; and Rocky H. Young, Assistant District Attorney General, for the appellee, State of Tennessee.

Wade V. Davies, Knoxville, Tennessee, for the amicus curiae, Tennessee Association of Criminal Defense Lawyers.

Patricia Head Moskal, Nashville, Tennessee, and Meir Feder, New York City, New York, for the amicus curiae, The Innocence Project.

OPINION

Actual Innocence

**Proof at Trial**

In 1996, the petitioner, James A. Dellinger, and his co-defendant, Gary Sutton, were convicted of the first degree premeditated murder of Tommy Griffin and sentenced to death. In the direct appeal of State v. Dellinger, we described the evidence at trial:

On the afternoon of [Friday,] February 21, 1992, Dellinger, Sutton, and Griffin spent several hours at Howie's Hideaway Lounge (Howie's) on Highway 321 in Maryville, Tennessee. The three men drank beer and played pool until approximately 7:00 p.m., when they left the bar in a dark-blue Camaro. Witnesses testified that there was no evidence of hostility among the men while they were in the bar.

Around 7:00 p.m. Cynthia and Kenneth Walker were traveling north on Alcoa Highway near the Hunt Road exit. They observed three men who appeared to be fighting in a dark-colored Camaro on the side of the road. Two of the men were standing outside of the car attempting to forcibly remove the third man from the back seat. Kenneth Walker used his portable radio to report the incident to the dispatcher for Rural Metro Blount County Ambulance.

Sharon Davis, who was also driving north on Alcoa Highway around the same time, observed a shirtless and shoeless man stumbling down the side of the road near the Hunt Road exit. When Davis passed the same area about thirty or forty minutes later, she saw two men standing outside of a dark-colored Camaro on the side of the road. They appeared to be looking for something.

. . . . Officer [Drew] Roberts found two men, not Dellinger and Sutton, standing next to a pickup truck [on the side of Hunt Road]. A shirtless man sitting on the bed of the truck identified himself as Griffin. Griffin told the officer that his

2

friends had put him out of a car. Griffin would not identify his friends or tell the officer what had happened. Officer Roberts arrested Griffin for public intoxication. Griffin was booked at the Blount County jail at 7:40 p.m. Dellinger arrived about forty-five minutes to an hour later to ask about Griffin's release. Sergeant Ray Herron explained to Dellinger that department policy required a minimum four-hour detention for public intoxication and advised him to come back at 10:30 or 11:00 p.m.

Alvin Henry was a resident of Bluff Heights Road, where Dellinger and Griffin both lived. At approximately 9:00 p.m., Henry looked out of his trailer window and saw Dellinger's white Dodge pickup truck. Henry saw someone enter the passenger side of the truck. The truck drove up the road and pulled into Dellinger's driveway. Henry then noticed fire shooting from Griffin's trailer down the road. . . . Arson investigator Gary Clabo concluded that the fire was set intentionally . . . .

Jennifer Branam, Griffin's niece, ran to Dellinger's trailer when she learned that Griffin's trailer was on fire. Just as Dellinger's wife was telling Jennifer that Dellinger was not home, Dellinger and Sutton walked down the hall from the living room. The two men were still wearing their jackets, and their pants were wet up to the knees. Jennifer asked them if Griffin was in his burning trailer, and Sutton told her that Griffin was in Blount County with a girl. When Jennifer asked the men to accompany her to the trailer, Dellinger responded that they were already in enough trouble.

After returning home, Jennifer looked out the window and saw Dellinger remove an object wrapped in a sheet from his truck and place it into the back of his wife's Oldsmobile. Jennifer testified that the object resembled a shotgun. Herman Lewis, a relative of Jennifer, also observed Dellinger moving an object from his truck to his wife's car shortly after 10:00 p.m. Dellinger and Sutton then left in the Oldsmobile.

At around 11:25 p.m. Dellinger and Sutton returned to the Blount County jail. Dellinger paid a cash bond for Griffin. Officers in the jail lobby overheard one of the defendants tell Griffin that they needed to get him back to Sevier County.

79 S.W.3d 458, 462-64 (Tenn. 2002).

No witnesses testified to seeing Griffin alive or speaking to him after he left the Blount County jail. Jason McDonald and his mother, Brenda McKeehan, testified that they heard two loud gunshots at 11:55 p.m. and that it was very unusual to hear gunshots at that time of night. Both witnesses also testified that the gunshots were fired from an area on the Little River in Blount County called the Blue Hole, which is approximately 500 yards down the hill from their residence.

3

At the time he heard the shots, Mr. McDonald was writing in his journal. His entry, which documented that he had heard the shots from "down the hill," was entered into evidence.

The next morning, [Saturday,] February 22, Jennifer Branam saw Dellinger leave his trailer, remove the object he had placed in his wife's car the night before, and place the object under his trailer.

. . . . At about 2:00 p.m., Connie Branam [Jennifer's mother and Griffin's sister] went to Jerry Sullivan's grocery store in Townsend asking if anyone had seen her brother. Sullivan then saw Branam speaking with two men in a white Dodge pickup truck in the grocery store parking lot.

Later that afternoon, Connie Branam accompanied Dellinger and Sutton to Howie's. . . .

. . . . When [Terry Lilly Newman] approached Branam, Dellinger, and Sutton to ask if they needed anything . . . Branam explained that she was looking for her brother and asked with whom he had left the bar. Newman became confused because she knew that Griffin had left with Dellinger and Sutton. Dellinger asked Newman if she remembered them returning to Howie's after they bailed Griffin out of jail, but Newman knew that the three had not returned to Howie's because she had worked until closing. After unsuccessfully attempting to convince Newman to join them in their search for Griffin, Sutton asked Newman if she was married. When Newman responded that she was married, Sutton stated, "[W]ell, your husband is going to be surprised whenever you're missing one morning, when he wakes up and you're missing." Dellinger, Sutton, and Branam left Howie's around 6:30 p.m.

About 8:00 p.m. that night, James and Barbara Gordon observed a fire in the woods near the Clear Fork area of Sevier County. The following morning, Barbara Gordon watched a white truck occupied by two men leave the woods and head toward the main road. She testified that the truck was traveling rapidly and that it came from the general area where they had observed the fire the night before.

On Monday, February 24, around 3:30 p.m. Griffin's body was discovered lying face-down on a bank at the Blue Hole. He had been shot in the back of the neck at the base of the skull with a shotgun. Two 12-gauge shotgun shell casings and beer cans were found near the body. The shotgun shells were fired from the same gun that fired shells later found in Dellinger's yard. . . . Dr. Eric Ellington with the Blount County Medical Examiner's Office conducted the autopsy on Griffin's body. He concluded that the cause of death was the destruction of the brain stem from the shotgun wound. Ellington retrieved two metal pellets and two pieces of shotgun wadding from Griffin's brain. The pellets were consistent with pellets loaded in the 12-gauge "00" buckshot casings found near Griffin's body.

4

On Friday, February 28, Connie Branam's body was discovered in her burned vehicle in the wooded area where the Gordons had observed the fire on February 22. Arson investigator Gary Clabo determined that the fire had been set by human hands . . . . Investigators discovered a rifle shell in the burned vehicle that had been fired from the .303 rifle later found in Dellinger's trailer.

Id. at 464-65.

The State's theory at trial was that Griffin died late on Friday, February 21, 1992, after leaving the jail with Dellinger and Sutton. In his defense, Dellinger called Dr. Larry Wolfe, a medical doctor and former county coroner. Dr. Wolfe opined that Griffin was killed between twenty-four and thirty-six hours before his body was found, placing the time of death between 3:30 a.m. and 3:30 p.m. on Sunday, February 23, 1992. In forming his opinion, Dr. Wolfe reviewed photographs of the body from the crime scene, the report of the paramedic who responded to the scene, autopsy photographs, Dr. Ellington's autopsy report, and the reported temperatures on the weekend of February 21, 1992. His opinion was based on the physical condition of the body, including evidence of "rigor mortis; . . . early transitional lividity, which is skin color change; the presence of bright red blood or coagulum; the lack of findings of early decomposition . . . ; a lack of fluid accumulation within certain tissues of the body, and a lack of softening of the G.I. tract."

The State did not call an expert to opine on Griffin's time of death in its case-in-chief but called Dr. Charles Harlan, a forensic pathologist, on rebuttal.[1] After reviewing the photographs and reports, Dr. Harlan testified that the victim was killed between 11:30 p.m. on Friday, February 21, 1992, and 8:00 a.m. on Saturday, February 22, 1992. Dr. Harlan agreed with Dr. Wolfe that rigor mortis was present when Griffin's body was found. He stated, however, that the presence of rigor mortis was consistent with the State's theory of the time of death because a body can remain in rigor up to seventy-two hours after death. Dr. Harlan disagreed with Dr. Wolfe's conclusion that the autopsy photographs and report indicated a "lack of finding of early decomposition." Finally, he testified, contrary to Dr. Wolfe, that the presence of early transitional lividity, bright red blood, and softening of the G.I. tract were not helpful in determining the time of death in this case.

Based on the evidence presented at trial, the jury convicted Dellinger and Sutton of the first degree premeditated murder of Griffin. At the sentencing hearing, the jury found that the evidence supported the prior violent felony aggravating circumstance, Tenn. Code Ann. 39-13-204(i)(2) (2006 & Supp. 2008),[2] and outweighed any mitigating circumstances beyond a reasonable doubt. The jury sentenced Dellinger and Sutton to death. The convictions and sentences were affirmed on direct appeal. Dellinger, 79 S.W.3d at 462, cert. denied, 537 U.S. 1090 (2002). Dellinger filed his initial

---

[1] Dr. Ellington testified for the State in its case-in-chief but stated that he was not qualified to render an opinion on Griffin's time of death.

[2] The prior violent felony aggravating circumstance was based on the convictions of Dellinger and Sutton in Sevier County in 1993 for the first degree premeditated murder of Connie Branam. In addition, Sutton had been convicted of aggravated assault in Cobb County, Georgia, in 1983.

5

petition for post-conviction relief from his conviction and sentence, *pro se*, on March 3, 2003. He was appointed counsel and filed an amended petition on August 11, 2003. The post-conviction trial court conducted a hearing on October 26-29, 2004, and on January 28, 2005.

## Proof at the Post-Conviction Hearing

Dellinger presented the testimony of two experts who had reviewed the photographs and reports presented at Dellinger's original trial. Dr. Neal Haskell, a board-certified forensic entomologist,[3] testified that the apparent lack of evidence of insects and insect eggs on the body indicated that it had been lying in the open less than twenty-four and no more than forty-eight hours when found. He placed the time of death between 3:30 p.m. on Saturday, February 22, 1992, and after sunrise on Monday, February 24, 1992. Dr. Haskell also evaluated climatological data at the site where the body was found, including the reported weekend temperatures and rain on February 23, 1992, but was unable to explain the absence of insect activity. He admitted that it was possible that others had overlooked the presence of insect activity but that fly eggs are "fairly large" and "observable." On cross-examination, Dr. Haskell conceded that none of the reports he reviewed expressly stated that no insect activity was observed. In his opinion, however, the lack of any reference to insect activity indicated that none was present.

Dr. Stanton Kessler, a forensic pathologist, testified that Griffin died within twelve to twenty-four hours before his body was found, placing the time of death between 3:30 p.m. on Sunday, February 23, 1992, and 3:30 a.m. on Monday, February 24, 1992. He based his opinion on evidence of rigor mortis, the absence of fixed lividity, the lack of evidence of decomposition, the presence of undigested food in Griffin's stomach, changes in the appearance of the wound, and the absence of insect activity. In Dr. Kessler's opinion, rigor mortis disappears within twenty-four to thirty-six hours after death. On cross-examination, Dr. Kessler stated that a white substance on Griffin's neck and head in one of the crime scene photographs was grains of unburned gunpowder, not fly eggs, but that a small "blackish" image next to Griffin's body in one of the crime scene photographs was a fly.

The State called Dr. William Bass, the forensic anthropologist who had testified regarding the death of Connie Branam in Dellinger's Blount and Sevier County trials. After reviewing the photographs and reports regarding Griffin's death, Dr. Bass testified that the fixed lividity visible on Griffin's face was consistent with the State's theory that Griffin was killed late on Friday, February 21, 1992. Dr. Bass also reviewed the reported weekend temperatures, which indicated a low of twenty-four degrees on the morning of February 22, 1992, and a high of sixty-nine degrees on February 24, 1992. In his opinion, the cool temperatures would have delayed the process of decay, explaining why there was "partially digested food" in Griffin's stomach as noted in the autopsy report. Furthermore, the notation of the presence of partially digested food indicated to Dr. Bass that the examiner was unable to identify specifically the food in Griffin's stomach. Dr. Bass

---

[3] Dr. Haskell stated that "[t]he study of entomology is the study of insects," and the work of forensic entomologists consists of "obtaining and reviewing . . . the insects that would have been collected at the scene, on the remains or in conjunction with the autopsy from the remains" to determine time or location of death.

stated that the presence of rigor mortis on February 24, 1992, did not contradict the State's theory because "[r]igor is also controlled by temperature." He also noted that a reduction in insect activity was consistent with the absence of fly activity in temperatures below fifty degrees, at night, or in the rain. Finally, Dr. Bass stated that the white substance on Griffin's neck and head was fly eggs, not gunpowder, and that the small, black image was a fly.

Dr. Haskell was recalled to testify after reviewing the testimony of Dr. Bass. Dr. Haskell testified that the white substance on Griffin's neck identified by Dr. Bass as fly eggs was buckshot buffer and that the fly identified by Dr. Bass and Dr. Kessler was actually a leaf tip overlying another leaf. He also stated that the reported climatological data did not contradict his finding that obvious insect activity would have been observable had Griffin's body been lying in the open as long as the State claimed.

On June 2, 2005, the post-conviction trial court filed "Findings of Fact and Conclusions of Law" denying Dellinger post-conviction relief. Dellinger filed a timely notice of appeal, and the Court of Criminal Appeals affirmed the post-conviction trial court's denial of relief. Dellinger v. State, No. E2005-01485-CCA-R3-PD, 2007 WL 2428049 (Tenn. Crim. App. Aug. 28, 2007). This Court granted Dellinger's application for permission to appeal on February 25, 2008.

**Analysis**

We granted Dellinger's application for permission to appeal to determine whether a freestanding claim of actual innocence is cognizable in an initial petition for post-conviction relief under the Tennessee Post-Conviction Procedure Act, Tennessee Code Annotated sections 40-30-101 through -122 (2006) ("the Act"). Dellinger contends that he may assert a freestanding claim of actual innocence because he has a right under the state and federal constitutions not to be imprisoned and executed for a crime that he did not commit. Because we find that the Act expressly provides for freestanding claims of actual innocence based on new scientific evidence, we decline to reach the broader constitutional issue posed by Dellinger.[4] See Owens v. State, 908 S.W.2d 923, 926 (Tenn. 1995) ("[U]nder Tennessee law, courts do not decide constitutional questions unless resolution is absolutely necessary for determination of the case and the rights of the parties."). Assuming without deciding, however, that a petitioner might obtain post-conviction review of a constitutional claim of actual innocence, standing alone, the evidence in this record fails to meet the threshold showing for such an assumed right. See Herrera, 506 U.S. at 417.

The issue of whether Dellinger may assert a freestanding claim of actual innocence under the Act is a question of law, which we review de novo with no presumption of correctness. Green v. Moore, 101 S.W.3d 415, 418 (Tenn. 2003). Our fundamental role in construing statutes is to ascertain and give effect to the General Assembly's intent. Fletcher v. State, 951 S.W.2d 378, 381-82 (Tenn. 1997). We must presume that the General Assembly "did not intend an absurdity and

---

[4] Whether the execution of an innocent person violates the federal constitution has not been decided by the United States Supreme Court. See House v. Bell, 547 U.S. 518, 554-55 (2006) (referring to the status of freestanding claims of actual innocence after Herrera v. Collins, 506 U.S. 390 (1993) as "left open" and "unresolved").

7

adopt, if possible, a reasonable construction which provides for a harmonious operation of the laws." Id. at 382.

At least two provisions of the Act are relevant to our determination of the General Assembly's intent concerning claims of actual innocence. First, Tennessee Code Annotated section 40-30-102(b)(2) does not bar claims for relief based on new scientific evidence establishing actual innocence.[5] Second, Tennessee Code Annotated section 40-30-117(a)(2) allows a petitioner to reopen the first post-conviction petition by claiming actual innocence based on new scientific evidence.[6]

Tennessee Code Annotated sections 40-30-102(b)(2) and -117(a)(2) therefore supply an avenue for relief when new scientific evidence of actual innocence becomes available after the filing of a post-conviction petition is time-barred. If new scientific evidence is available when a petition for post-conviction is filed, both logic and judicial economy dictate that this evidence should be permitted at that time. We can discern no rational basis for precluding new scientific evidence of actual innocence until after the conclusion of the initial post-conviction proceedings.[7]

The Act requires that a petitioner prove the allegations of fact in the first post-conviction petition by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); Pylant v. State, 263 S.W.3d 854, 868 (Tenn. 2008). The State's theory at trial was that Griffin died close to midnight on Friday, February 21, 1992, after leaving the jail with Dellinger and Sutton and around the time gunshots were heard in the area where his body was found on February 24, 1992. The jury's verdict convicting Dellinger and Sutton of the murder indicates that the jury accredited the State's theory. Dellinger's claim of actual innocence rests primarily on the expert testimony of Dr. Haskell and Dr. Kessler at the post-conviction hearing that Griffin died later than 3:30 p.m. on Saturday, February 22, 1992.

Assuming, without deciding, that the testimony of Dellinger's post-conviction experts constitutes "new scientific evidence," we would conclude that Dellinger has failed to carry his

---

[5] Tennessee Code Annotated section 40-30-102 provides: "(b) No court shall have jurisdiction to consider a petition filed after the expiration of the limitations period unless: . . . (2) [t]he claim in the petition is based upon new scientific evidence establishing that the petitioner is actually innocent of the offense or offenses for which the petitioner was convicted[.]"

[6] Tennessee Code Annotated section 40-30-117 provides: "(a) A petitioner may file a motion in the trial court to reopen the first post-conviction petition only if . . . (2) [t]he claim in the motion is based upon new scientific evidence establishing that the petitioner is actually innocent of the offense or offenses for which the petitioner was convicted[.]"

[7] Claims of actual innocence not based on new scientific evidence may be brought in a petition for writ of error coram nobis, Tenn. Code Ann. § 40-26-105 (2006), within one year after the judgment of conviction in the trial court becomes final, State v. Mixon, 983 S.W.2d 661, 670 (Tenn. 1999), or later if the petitioner shows that due process precludes application of the statute of limitations, Workman v. State, 41 S.W.3d 100, 103 (Tenn. 2001). Such a claim may also be brought in an application for executive clemency once "all possible state judicial remedies" have been exhausted. Tenn. Code Ann. § 40-27-109 (2006).

burden of proof. The most compelling evidence Dellinger presented was the testimony of Dr. Haskell that the photographs and reports do not indicate the presence of insect activity. Dr. Bass stated, however, that one of the photographs depicted a fly next to the body as well as fly eggs on Griffin's head and neck. He also explained that flies are not active in temperatures below fifty degrees, in the rain, or at night. In his opinion, the temperatures also explained the presence of undigested food in Griffin's stomach. Finally, contrary to Dr. Kessler, Dr. Bass stated that fixed lividity was present on Griffin's face in the photographs.

In short, we agree with the State that the post-conviction trial court heard the classic "battle of the experts" with regard to Griffin's time of death. Dellinger argues nonetheless that this Court should afford more weight to the testimony of Dr. Haskell and Dr. Kessler because they are more qualified than Dr. Bass to render an opinion on the time of death. In denying Dellinger relief, however, the post-conviction trial court implicitly accredited Dr. Bass's testimony. It is well established that appellate courts do not reassess credibility determinations. R.D.S. v. State, 245 S.W.3d 356, 362 (Tenn. 2008) ("Questions surrounding the credibility of witnesses and the 'resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact.'") (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)).

Furthermore, "'[w]here there is any conflict between expert testimony and the testimony as to the facts, the jury is not bound to accept expert testimony in preference to other testimony, and must determine the weight and credibility of each in the light of all the facts shown in the case.'" State v. Sparks, 891 S.W.2d 607, 616 (Tenn. 1995) (quoting Edwards v. State, 540 S.W.2d 541, 647 (Tenn. 1976)). Jason McDonald and his mother, Brenda McKeehan, testified that they heard two gunshots at 11:55 p.m. on Friday, February 21, 1992, fired from the area where Griffin's body was discovered. They both stated that it was highly unusual to hear gunshots at that time of night. Also, no witnesses testified to having seen or heard from Griffin after he left the jail and before 3:30 p.m. the next day, the earliest time of death proffered by Dellinger's experts. If Griffin were alive, it is improbable that no one would have been in contact with him during that time, especially considering that his home had burned down and his family was looking for him.

Ineffective Assistance of Counsel

**Proof at the Post-Conviction Hearing**

In support of his ineffective assistance of counsel claim, Dellinger presented the testimony of his appointed trial counsel, Mr. Charles Deas and Mr. Eugene Dixon.

Mr. Deas and Mr. Dixon both began practicing law in the mid-1970s. Dellinger's case was their first capital murder case to go to trial although they had each tried non-capital murder cases. Both Mr. Deas and Mr. Dixon were aware, however, of the heightened standards required of attorneys representing capital defendants. In preparation for trial, they attended portions of Dellinger's Sevier County trial and a death penalty seminar. They also worked closely with co-defendant Sutton's attorneys. The attorneys allocated the responsibility for preparation, with Mr.

Deas taking the "mitigation phase" and Mr. Dixon taking the "factual witnesses" during the guilt phase.

Mr. Dixon testified that he consulted with a forensic pathologist, Dr. Cleland Blake, as a potential expert witness regarding the time of Griffin's death. Dr. Blake's opinions, however, were not helpful to the defense. In fact, the State unsuccessfully attempted to call Dr. Blake as an expert witness during its case-in-chief. The trial court did not permit Dr. Blake's testimony because he had been retained previously by the defense. Mr. Deas and Mr. Dixon instead obtained the expert testimony of Dr. Larry Wolfe to establish that Griffin died later than the State theorized. In reference to Dr. Wolfe's testimony, Mr. Deas stated, "We knew it was coming. We knew we had it. We were hoping, factually speaking that it would carry the day."

Trial counsel filed a pre-trial motion requesting that the State provide the names of its rebuttal witnesses. Dr. Harlan's name was not provided as a potential rebuttal witness, and Mr. Deas and Mr. Dixon were surprised when the State called Dr. Harlan to rebut the testimony of Dr. Wolfe. Mr. Deas could not recall, however, why neither he nor Mr. Dixon objected to the State's lack of notice of Dr. Harlan's rebuttal testimony. They did, however, object to the State's introduction of opinion testimony on rebuttal. Mr. Dixon stated that he and Mr. Deas discussed the unanticipated testimony but decided not to move for a continuance because Dr. Wolfe's testimony had already discredited the State's theory of the time of death.

**Burden of Proof**

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend VI. The right to effective assistance of counsel is inherent in this right. Cuyler v. Sullivan, 446 U.S. 335, 344 (1980). In Strickland v. Washington, 466 U.S. 668 (1984), the United States Supreme Court set forth a two-prong test to prove ineffective assistance of counsel. The test requires the petitioner to prove both deficient performance of counsel and prejudice to the defense. Id. at 687. Deficient performance requires proof that "counsel's representation fell below an objective standard of reasonableness," id. at 687-88, despite a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," id. at 689. Prejudice requires proof of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

Dellinger argues that Tennessee procedural rules, specifically Tennessee Code Annotated section 40-30-110(f) and Tennessee Supreme Court Rule 28 section 8(D)(1), are contrary to the requirements of Strickland and that the post-conviction trial court therefore applied an incorrect burden of proof to his ineffective assistance of counsel claims. Whether the post-conviction trial court applied the correct burden of proof is a question of law that we review de novo with no presumption of correctness. Green, 101 S.W.3d at 418.

Tennessee Code Annotated section 40-30-110(f) (2006) provides that the "petitioner shall have the burden of proving the *allegations of fact* by clear and convincing evidence." (emphasis

added).  This inquiry does not implicate the Strickland inquiry.  Pursuant to section 40-30-110(f), the petitioner is required to prove the *fact* of counsel's alleged error by clear and convincing evidence.  If that burden of proof is met, the court then must assess under Strickland whether that error "fell below an objective standard of reasonableness," Strickland, 466 U.S. at 687-88, and whether the error raised "a reasonable probability . . . that the result of the proceedings would have been different," id. at 694.

While not identical to section 40-30-110(f), Tennessee Supreme Court Rule 28 section 8(D)(1) provides that the "[p]etitioner shall be required to present petitioner's case and to establish the grounds alleged *and the entitlement to relief* by clear and convincing evidence."  (emphasis added).  Dellinger contends that the post-conviction trial court applied this standard and thereby applied an erroneous burden of proof to his claims of ineffective assistance of counsel.  Dellinger supports his contention by pointing to a single statement in the post-conviction trial court's "Findings of Fact and Conclusions of Law": "[t]he burden is on the petitioner to prove both prongs [of the Strickland test] by clear and convincing evidence.  Tenn. Code Ann. § 40-30-210(f); State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999)."  Although this statement is imprecise, we agree with the State that the post-conviction trial court did not misapply the law.

First, the post-conviction trial court's direct citation to Tennessee Code Annotated section 40-30-210(f)[8] indicates that it limited its application of the clear and convincing standard to allegations of fact in accordance with that statute.  Moreover, in Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001), we determined that an almost identical misstatement of law was "one of imprecision in the use of [the Court of Criminal Appeals'] language, as it [is] clear from the opinion that the court applied the correct legal standard."  We relied in part on the intermediate appellate court's earlier reference to the Strickland standard.  Id. at 458 n.6.  Similarly, in the case at bar, the post-conviction trial court's "Findings of Fact and Conclusions of Law" includes an earlier reference to the correct Strickland standard:  "Dellinger must establish that the advice given or the services rendered were not within the range of competence demanded of attorneys in criminal cases and that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'  Strickland, 466 U.S. at 693 (1984)."

To provide needed clarity concerning the burden of proof in claims of ineffective assistance of counsel and to avoid any appearance of inconsistency between Tennessee Supreme Court Rule 28 and Tennessee Code Annotated section 40-30-110(f), we concurrently amend Tennessee Supreme Court Rule 28 section 8(D)(1) to read as follows: "Petitioner shall be required to present petitioner's case and to establish the factual grounds alleged by clear and convincing evidence."

### Analysis

Our review of Dellinger's ineffective assistance of counsel claims, a mixed question of law and fact, is de novo with no presumption of correctness.  Finch v. State, 226 S.W.3d 307, 315 (Tenn.

---

[8] Tenn. Code Ann. § 40-30-210(f) was renumbered as Tenn. Code Ann. § 40-30-110(f) in 2003.

2007). This Court is bound by the factual findings of the post-conviction trial court unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006).

Dellinger first argues that his trial counsel was deficient in failing to obtain a qualified forensic pathologist to testify as to Griffin's time of death. The testimony of Mr. Deas and Mr. Dixon at the post-conviction hearing indicates that both attorneys were aware that Griffin's time of death was a critical issue. Mr. Dixon testified that he met and exchanged correspondence with a forensic pathologist, Dr. Blake, as a potential expert witness. Dr. Blake's opinions, however, were not helpful to the defense.

It was only after consulting with a forensic pathologist that trial counsel chose to utilize the expert testimony of Dr. Wolfe, a medical doctor and former county coroner. Although Dr. Wolfe was not a board-certified forensic pathologist, he had experience in examining bodies and had given his opinion as to cause and time of death in up to forty-five cases. In reference to Dr. Wolfe's testimony, Mr. Deas stated, "We knew it was coming. We knew we had it. We were hoping, factually speaking that it would carry the day." Dr. Wolfe did testify, consistent with the theory of the defense, that Griffin had been dead no more than thirty-six hours when his body was found.

Dellinger also argues that trial counsel was deficient in failing to obtain another expert to rebut the State's expert, Dr. Harlan. The State did not provide Mr. Deas and Mr. Dixon with notice that Dr. Harlan would be called to testify on rebuttal. Although Mr. Deas and Mr. Dixon did not object to Dr. Harlan's testimony on this ground, they did object to permitting the State to offer opinion evidence on rebuttal. The State responded by reminding the court that the State had presented a witness earlier, presumably Dr. Blake, but that defense counsel's objection prevented Dr. Blake from testifying.

Mr. Dixon testified that he and Mr. Deas decided not to move for a continuance because they felt that Dr. Wolfe's testimony had discredited the State's time of death theory. On a claim of ineffective assistance, "the petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings." Thompson v. State, 958 S.W.2d 156, 162 (Tenn. Crim. App. 1997) (citing Adkins v. State, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994)).

Furthermore, Dellinger has not proven a reasonable probability that the result of his trial would have been different if the testimony of Dr. Haskell and Dr. Kessler had been presented during his original trial. First, both experts' testimony was rebutted by Dr. Bass. Second, neither expert's testimony undermines the testimony of Jason McDonald and Brenda McKeehan, which the jury implicitly accredited. Both witnesses testified that they heard two gunshots at 11:55 p.m. on Friday, February 21, 1992, fired from the area where Griffin's body was discovered. As we previously stated, "the jury is not bound to accept expert testimony in preference to other testimony, and must determine the weight and credibility of each in the light of all the facts shown in the case.'" Sparks, 891 S.W.2d at 616 (quoting Edwards, 540 S.W.2d at 647).

12

## Conclusion

We conclude that a freestanding claim of actual innocence based on new scientific evidence is cognizable in an initial petition for post-conviction relief under the Tennessee Post-Conviction Procedure Act. Therefore, we reverse the Court of Criminal Appeals' disposition of that issue. We affirm the Court of Criminal Appeals' denial of relief, however, because Dellinger has not met his burden of proof to support such claim. We also hold that Dellinger is not entitled to relief on his claims of ineffective assistance of counsel or his claim that the post-conviction trial court applied an erroneous burden of proof to his ineffective assistance of counsel claims. Finally, we concurrently amend Tennessee Supreme Court Rule 28 section 8(D)(1) to read as follows: "Petitioner shall be required to present petitioner's case and to establish the factual grounds alleged by clear and convincing evidence."

The Court of Criminal Appeals properly determined all of the remaining issues raised by Dellinger. Specifically, the intermediate appellate court applied the appropriate standard of review and held that: (1) Dellinger was not entitled to relief on his claim under Brady v. Maryland, 373 U.S. 83 (1963); (2) Dellinger was afforded a full and fair hearing of his post-conviction petition; and (3) none of Dellinger's constitutional challenges to the death penalty were meritorious. Dellinger, 2007 WL 2428049, *19-43. We affirm the judgment of the Court of Criminal Appeals with respect to each of these issues.

Dellinger's sentence of death shall be carried out on June 3, 2009, unless otherwise ordered by this Court or other proper authority. It appearing that Dellinger is indigent, the costs of this appeal are taxed to the State of Tennessee.

_____
JANICE M. HOLDER, CHIEF JUSTICE

13