IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 14, 2026 Session

**JEFFREY LEE POTTS v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2017-A-114      Jennifer Smith, Judge**
_____

**No. M2024-01853-CCA-R3-PC**
_____

Petitioner, Jeffrey Lee Potts, claims the post-conviction court erred by denying his petition for relief from his conviction for attempted second degree murder. On appeal, Petitioner claims (1) that Tennessee Code Annotated section 40-30-110(f), which requires that petitioners prove "allegations of fact by clear and convincing evidence," is inconsistent with *Strickland v. Washington*, 466 U.S. 668 (1984), and "erects an unconstitutional barrier to relief" and (2) that trial counsel rendered ineffective assistance by failing to obtain and call a use-of-force expert witness at trial. Discerning no error, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which TIMOTHY L. EASTER and JILL BARTEE AYERS, JJ., joined.

Daniel J. Murphy, Lewisburg, Tennessee, for the appellant, Jeffrey Lee Potts.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and D. Paul Dewitt and Doug Thurman, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**Procedural History**

This case arises from an August 14, 2016 shooting at the Davidson County townhouse of Jennifer Burnett. Petitioner, who had been romantically involved with Ms. Burnett while she was married to the victim, Michael Thomson, shot the victim five times, leaving him permanently paralyzed.

A Davidson County grand jury indicted Petitioner for attempted first degree premeditated murder, and a petit jury convicted him of the lesser-included offense of attempted second degree murder. The trial court sentenced Petitioner as a Range I offender to twelve years' incarceration. The judgment was affirmed on direct appeal. *State v. Potts*, No. M2020-01623-CCA-R3-CD, 2022 WL 2348233, at *1 (Tenn. Crim. App. June 29, 2022), *perm. app. denied* (Tenn. Dec. 14, 2022).

## Summary of the Factual Background

The following factual summary is derived from this court's opinion from the direct appeal. *Id*. at *1-14.

The victim testified that he married Ms. Burnett in December 2013, at which time Ms. Burnett and her daughter Rebecca Burnett[1] moved into his house in Lebanon, and Ms. Burnett began renting out a townhouse she owned in Davidson County. In addition, the victim and Ms. Burnett owned other rental properties that were managed by Ms. Burnett. Ms. Burnett hired Petitioner to do maintenance work at their properties. *Id*. at *1.

The victim and Ms. Burnett experienced marital difficulties leading to the victim's filing for divorce in the spring of 2016. On July 19, 2016, Ms. Burnett obtained a temporary order of protection against the victim based on allegations of domestic abuse. The order of protection required the victim to leave his residence in Lebanon and prohibited the victim from possessing a firearm. *Id*. at *1-2.

The victim claimed that he learned that Petitioner and Ms. Burnett were having an affair on the day Ms. Burnett obtained the order of protection, after allegedly seeing them kissing in the parking lot. The victim told Rebecca that he had wanted to kill Petitioner. On the same day the order of protection was issued, the victim returned to the Lebanon residence and was arrested for violating the order of protection. The victim admitted that several violent incidents had occurred between himself and Ms. Burnett. *Id*.

According to Ms. Burnett, the order of protection was dismissed on August 4, 2016, after she signed divorce papers and agreed to move out of the victim's home within ten days. After the dismissal of the order of protection, the victim retrieved his firearms from the safe. *Id*. at *2.

On August 9, 2016, the victim met Ms. Burnett in the parking lot of a Kroger near Ms. Burnett's townhouse. The victim "wore his Glock pistol on his hip at the meeting." During the meeting at Kroger, Ms. Burnett agreed to travel to New York City and then to

---

[1] We will refer to Rebecca Burnett as Rebecca to avoid confusion.

Nicaragua with the victim. Before leaving for New York, the victim paid to have the locks on Ms. Burnett's townhouse changed so that Petitioner could not enter. *Id*. at *2-3.

On Friday, August 12, the victim and Ms. Burnett flew from Nashville to New York City. Ms. Burnett asked Petitioner to care for her pets while she was away. They returned to Nashville on August 14. On the date of the shooting, the victim sent Petitioner a lengthy text message about his reunion with Ms. Burnett and calling Petitioner "a stalking, crying piece of s--t." The victim also sent a text to Rebecca asking if Petitioner had a key to the townhouse. After Rebecca replied that Petitioner did not have a key, the victim texted Rebecca, "Okay, I'm just making sure I don't have to kill me an MF if he comes in." *Id*. at *4. After returning to Nashville, the victim and Ms. Burnett drove to Ms. Burnett's townhouse. The victim testified that he did not suspect that Petitioner would be at the townhouse. *Id*. at *3.

The victim followed Ms. Burnett into the townhouse. When the victim stepped inside, Petitioner opened fire "from an elevated position over a short wall." The first shot hit the victim in his chest. Petitioner fired seven rounds, emptying the magazine and striking the victim five times. The victim, who was permanently paralyzed as a result of his injuries, testified that he was not armed when he entered the townhouse. *Id.*

Rebecca corroborated the victim's physical abuse of her mother. On August 9, the victim sent Rebecca multiple texts saying that the locks on her mother's townhouse were being changed and "expressing his anger" that Petitioner had a key to the townhouse. Rebecca described the victim as "freaking out" because he thought Petitioner was staying in the townhouse. She testified that the victim often carried a gun in a holster and that the victim was larger than Petitioner. *Id*. at *5.

Ms. Burnett provided detailed testimony regarding the physical abuse she suffered at the hands of the victim. She said that in April 2015, the victim "punched her four times during an argument while she was driving and then punched her four more times after she pulled over." Ms. Burnett testified that in October 2015, during an argument while driving home from dinner, the victim struck her with the back of his hand, breaking her front teeth with his "special forces" ring. She testified that in May 2016, the victim told her that "their pending divorce action would not matter because she would be dead soon." She said that in June 2016, the victim placed her in a "choke hold, causing her earring to poke into her neck." Multiple photographs reflecting injuries to Ms. Burnett caused by the victim were entered into evidence. *Id.* at *5.

Ms. Burnett explained that she had agreed to go on two trips with the victim "to keep the victim happy and away from [Petitioner]." Ms. Burnett said that, when she went with the victim to the townhouse on the evening of the shooting, "she was not expecting

- 3 -

[Petitioner] to be there or she would not have gone." Ms. Burnett "estimated that she had been in the house for only about thirty seconds and was eight feet inside of the house when [Petitioner] started shooting." *Id*. at *10.

According to Petitioner, the victim learned of the affair on August 4, 2016, when he found text messages between Petitioner and Ms. Burnett. A few days later, Petitioner went to the victim's house to help Ms. Burnett move the rest of her belongings. While there, the victim "demanded to look inside two suitcases that [Petitioner] was carrying." Petitioner stated that the victim "had a pistol on his hip and threatened to 'end' him if he removed any property that did not belong to Ms. Burnett." *Id*. at *8.

Petitioner said that Rebecca called him to advise him that the victim had sent her a text message threatening to kill Petitioner. Petitioner said that he called the police on both August 10 and August 14 seeking information about how to obtain an order of protection against the victim. After speaking with police, Petitioner went to a storage unit and obtained a handgun to protect himself. *Id*. at *9-10.

Petitioner was in the bedroom of Ms. Burnett's townhouse on the evening of August 14, when he heard a car pull into the driveway. Petitioner looked out the window and saw the victim's black BMW. Petitioner said that he knew the victim had been in the military and "had received specialized training in fighting." He also said the victim was bigger than he was and often carried a handgun. He said he was afraid because he thought that the victim "was there to finish what he started, to kill [him]." Petitioner said that he immediately called 911. While on the phone with the 911 operator, Petitioner grabbed the handgun that he had retrieved earlier from the storage unit. By the time he walked out of the bedroom, the victim was already entering the townhouse. Petitioner said that he shot the victim in self-defense because he feared for his life. He only remembered shooting one time, but he acknowledged that he fired seven rounds. *Id*. at *10-11.

Dr. Stephen Montgomery, a forensic psychiatrist, testified as an expert witness for the defense. He stated that he interviewed Petitioner and reviewed police reports, witness statements, Petitioner's 911 call, and Petitioner's medical and mental health treatment records from the Veterans Administration Hospital for the past eighteen years. Dr. Montgomery opined that, at the time Petitioner shot the victim, Petitioner was suffering from post-traumatic stress disorder (PTSD) and was not "sufficiently free of excitement and passion as to be capable of exercising reflection and judgment" prior to shooting the victim. Dr. Montgomery also opined that Petitioner "was not capable of forming premeditation." On cross-examination, Dr. Montgomery "conceded that the Defendant had not reported any signs or symptoms of PTSD prior to the date of the shooting." *Id.* at *11-12.

- 4 -

The jury convicted Petitioner of attempted second degree murder. Following a sentencing hearing, the trial court sentenced Petitioner as a Range I offender to twelve years' incarceration. *Id.* at *14.

## Post-Conviction Relief Hearing

Petitioner filed a timely pro se petition for post-conviction relief, and appointed counsel filed two amended petitions. As relevant to issues preserved in this appeal, Petitioner claimed that trial counsel was ineffective for failing to call an expert to opine that Petitioner's use of force was reasonable "based on the totality of circumstances." Petitioner also claimed that the clear and convincing evidence standard "is utterly inconsistent" with the "reasonable probability standard" of *Strickland* and "is therefore unconstitutional."

At the August 9, 2024 evidentiary hearing, Petitioner tendered Melvin Brown as an expert regarding use of force and/or self-defense. Mr. Brown testified that, after his discharge from the Navy, he served in the United States Army Reserve, where he attended military police school. In 1984, he was hired by the Metropolitan Nashville Police Department (MNPD). He started as a patrol officer and was promoted to patrol sergeant and then patrol lieutenant. He was on the SWAT team from 1987 until his first Iraq deployment in 2004.

During Mr. Brown's time with MNPD, he attended the police academy and underwent numerous hours of firearms training. He later taught use of firearms, defensive tactics, and empty hand self-defense at the police academy. Mr. Brown testified that he had undergone training on the type of force that "is deemed legally objectively reasonable" and the use of force that is "outside what is objectively reasonable." He also operated a martial arts training facility in Nashville for a little over thirty years. He retired from MNPD in 2014. From 2014-2018, he served as Tennessee Alcoholic Beverage Commission (TABC) Special Agent-in-Charge and as the Defensive Tactics & Firearms Instructor. From 2018 to the time he testified, he was employed by TABC as an Inspector and Special Assistant to the Executive Director of the Metro Nashville Beer Permit Board and was currently a police officer at Volunteer State Community College.

Mr. Brown said that he testified as a use-of-force expert for a defendant in a 2025 Williamson County homicide trial. He estimated that over the last twenty or thirty years, he had testified as an expert no less than ten and no more than twenty times, of which four or five were in court and the rest by deposition. He said about one-half of the cases in which he testified involved use of force by law enforcement and the other half involved use of force by civilians. He said that the standards were different for each group.

The State objected to Mr. Brown's qualifications to testify as an expert on use of force by a civilian. The State argued that use-of-force expert testimony was not needed because Petitioner had testified at trial, the jury was instructed on self-defense, and the jury determined that Petitioner did not act in self-defense. Petitioner argued that Mr. Brown could have provided "specialized knowledge based on his training of what it's like in that situation."

The post-conviction court noted that Mr. Brown's report stated that Petitioner "had an actual honest belief that there was a threat of bodily injury, that any other reasonable person would have feared imminent harm." The court recognized that Mr. Brown had "specialized knowledge [] in law enforcement tactics" and "extensive military experience and training." However, the court found that this case does not involve use of force by law enforcement nor does it involve someone "trying to disarm an armed aggressor." The court found that this was a domestic setting and that Mr. Brown was being offered as an expert "to speak to the ultimate question of what was in [Petitioner]'s mind at the time of this event." The court noted that Petitioner "testified to that and the jury rejected it." The court concluded that, had Mr. Brown "been proffered by the defense counsel at trial, the [c]ourt would not have qualified [him] as an expert in this case because the area of expertise is not relevant to the questions before the jury" and "would not have substantially assisted the trier of fact."

One of the two lawyers who represented Petitioner in the trial testified that he had been employed by the Metropolitan Nashville Public Defender's Office for twenty-seven years. He was only questioned about his direct examination of MNPD Officer Richard Olive and his decision not to move for a mistrial based on alleged hearsay testimony by Officer Olive. Neither the State nor Petitioner questioned trial counsel about trial strategy or about counsel's decision to call a forensic psychiatrist to testify as an expert and not call a use-of-force expert.

The post-conviction court took the matter under advisement and issued a written "Memorandum and Order" addressing all claims raised in the pro se and amended petitions. The court found all except three claims were waived because Petitioner presented no proof or argument at the evidentiary hearing to support those claims. The court found the claim related to Officer Olive's testimony was without merit.

The other two claims are the claims Petitioner raised in this appeal. The post-conviction court noted that Mr. Brown's report stated he was hired to determine "whether the actions alleged to have been committed by [Petitioner] were in whole or in part justified as an act or acts of lawful self-defense in consideration of the totality of the circumstances." The court found that Mr. Brown's opinions were derived from an "extensive analysis" applying the police use-of-force standard, a doctrine wholly inapplicable here, and that

admitting his testimony would have risked confusing the issues, would not have substantially assisted the trier of fact, and would have invaded the jury's province on the issue of self-defense.

The post-conviction court also concluded that Petitioner's defense was in no way prejudiced by trial counsel's failure to present expert proof on use of force because the jury was "fully instructed on self-defense, and the factual and legal analysis necessary to reach a conclusion" on self-defense.

The post-conviction court found that the decision to hire and call an expert witness was a "strategic decision" that is entitled to a "strong presumption of reasonableness." The court concluded that Petitioner's trial counsel were not ineffective for failing to call a use-of-force expert and denied the petition.

Petitioner timely appealed.

## Analysis

On appeal, Petitioner raises two issues. First, he claims Tennessee's clear and convincing evidence standard for post-conviction relief is inconsistent with *Strickland* and is, therefore, unconstitutional. Second, he claims the post-conviction court erred by denying relief based on trial counsel's failure to call a use-of-force expert at trial. The State argues that the post-conviction court applied the appropriate standard of proof established in *State v. Dellinger*, 279 S.W.3d 282 (Tenn. 2009), and properly concluded that Petitioner failed to demonstrate trial counsel were ineffective. We agree with the State.

## Clear and Convincing Evidence Standard

Petitioner argues that

Tennessee's post-conviction framework, as articulated in Tenn. Code Ann. § 40-30-110(f) and upheld in *Dellinger*, erects an unconstitutional barrier to relief. It contravenes *Strickland* by requiring that factual predicates be proved by a level of certainty that exceeds what the Sixth Amendment demands — and effectively makes the exercise of federal constitutional rights in post-conviction proceedings illusory. Such a framework is not a faithful application of *Strickland*, but a judicially constructed obstacle to its enforcement.

Since enactment of the Post-conviction Procedure Act of 1995, petitioners have had "the burden of proving the allegations of fact by clear and convincing evidence." Tenn.

Code Ann. § 40-30-110(f). In 2009, our supreme court amended Tennessee Supreme Court Rule 28 section 8(D)(1) so that a petitioner's burden of proof for allegations of fact under Rule 28 was the same as the burden of proof under Tennessee Code Annotated section 40-30-110(f). *Dellinger*, 279 S.W.3d at 294.

In *Dellinger*, the petitioner argued that "Tennessee Code Annotated section 40-30-110(f) and Tennessee Supreme Court Rule 28 section 8(D)(1), are contrary to the requirements of *Strickland* and that the post-conviction . . . court therefore applied an incorrect burden of proof to his ineffective assistance of counsel claims." *Id*. at 293. Our supreme court found that requiring a petitioner "to prove the fact of counsel's alleged error by clear and convincing evidence" does not implicate "the *Strickland* inquiry." *Id*. (emphasis omitted). The court noted that, "[i]f that burden of proof is met, the court then must assess under *Strickland* whether that error 'fell below an objective standard of reasonableness,'" and "whether the error raised 'a reasonable probability . . . that the result of the proceedings would have been different[.]'" *Id*. at 294 (quoting *Strickland,* 466 U.S. at 687-88, 694); *see also Phillips v. State*, 647 S.W.3d 389, 401 (Tenn. 2022).

As an intermediate appellate court, the Tennessee Court of Criminal Appeals is bound by Tennessee Supreme Court precedent. *State v. Pendergrass*, 13 S.W.3d 389, 397 (Tenn. Crim. App. 1999); *State v. Jones*, No. W2016-01550-CCA-R3-CD, 2017 WL 2820173, at *1 (Tenn. Crim. App. June 29, 2017); *State v. Crank*, No. E2012-01189-CCA-R3-CD, 2013 WL 5371627, at *6 (Tenn. Crim. App. Sept. 26, 2013), *aff'd*, 468 S.W.3d 15 (Tenn. 2015). We agree with the State's argument that this court is no more at liberty to overrule *Dellinger* than it would be to overrule *Strickland*. The issue raised by Petitioner is without merit.

**Effective Assistance of Counsel**

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. *Strickland*, 466 U.S. at 687; *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for a court to grant post-conviction relief. *Strickland*, 466 U.S. at 687; *Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997); *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of

hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley*, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." *Henley*, 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)); *see also Goad*, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Therefore, under the second prong of the *Strickland* analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

Post-conviction relief cases often present mixed questions of law and fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such findings. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. *Id.*; *Fields*, 40 S.W.3d at 456 (citing *Henley*, 960 S.W.2d at 578). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Fields*, 40 S.W.3d at 456 (citing *Henley*, 960 S.W.2d at 579); *see also Kendrick*, 454 S.W.3d at 457. The post-conviction court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. *Kendrick*, 454 S.W.3d at 457.

In cases where a petitioner claims that trial counsel failed to present a witness in support of the petitioner's defense, including an expert witness, the petitioner must present such witness at the post-conviction hearing. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). The post-conviction court must then determine whether the testimony of that witness "would have been (1) admissible . . . and (2) material to the defense" if it had been presented at trial. *Pylant v. State*, 263 S.W.3d 854, 869 (Tenn. 2008).

Questions regarding the qualifications, admissibility, relevancy, and competency of expert testimony are matters left within the broad discretion of the trial court or in this case the post-conviction court. *State v. Stevens*, 78 S.W.3d 817, 832 (Tenn. 2002). The post-conviction court's ruling shall not be overturned on appeal absent a finding that the court "abused its discretion in admitting or excluding the expert testimony." *Id.* Even if the post-conviction court determines that the testimony of an expert witness would have been admissible, trial counsel would not be deficient for failing to call the expert witness at trial if the testimony would not have "materially aided the petitioner's defense[.]" *Pylant*, 263 S.W.3d at 869.

Petitioner proffered Mr. Brown as an expert in use of force, and the State objected to Mr. Brown's qualifications to testify as an expert on use of force by a civilian. In Tennessee, the admissibility of expert testimony is governed by Tennessee Rules of Evidence 702 and 703. *State v. Bargery*, No. W2016-00893-CCA-R3-CD, 2017 WL 4466559, at *46 (Tenn. Crim. App. Oct. 6, 2017), *no perm. app. filed.* Rule 702 states, "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702. "Trial courts act as gatekeepers when it comes to the admissibility of expert testimony." *State v. Scott*, 275 S.W.3d 395, 401 (Tenn. 2009). "The determinative factor is whether the witness's qualifications authorize him or her to give an informed opinion *on the subject at issue*." *Stevens*, 78 S.W.3d at 834.

The post-conviction court recognized that Mr. Brown "performed an extensive analysis using the police use-of-force standard" but found that this standard "was wholly inapplicable in this case." The court found that Mr. Brown's ultimate conclusion was that

> the actions of [Petitioner] were objectively reasonable and proportional [under the] law self-defense and the injuries to the victim were not caused by malice, carelessness, recklessness, or indifference by [Petitioner] if the mental state of [Petitioner], supported by qualified psychological experts, caused him to believe the imminent danger was present whether it existed or not.

The court found the above-quoted conclusion "misstated the law of self-defense" and "any conceivable relevancy" Mr. Brown's conclusion had "would have been substantially outweighed by the risk of confusion of the issues and misleading the jury." Questions regarding the qualifications, admissibility, relevancy, and competency of expert testimony are matters left within the broad discretion of the post-conviction court, and the post-conviction court found that, had Mr. Brown "been proffered by the defense counsel at trial, the [c]ourt would not have qualified [him] because the area of expertise [wa]s not

relevant to the questions before the jury" and that his testimony "would not have substantially assisted the trier of fact."

In this case, trial counsel decided to call Dr. Montgomery, a forensic psychiatrist, as an expert at trial. Dr. Montgomery opined that Petitioner was suffering from PTSD and was not "sufficiently free of excitement and passion as to be capable of exercising reflection and judgment" prior to shooting the victim. Although each case "must stand on its own facts," "[i]n most cases, [] the decision to select an expert, or which expert to select, constitutes one of the 'strategic' defense decisions that *Strickland v. Washington* shields from scrutiny." *Kendrick*, 454 S.W.3d at 475. Strategic decisions "made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]" *Strickland*, 466 U.S. at 690. During the post-conviction hearing, Petitioner decided not to even question trial counsel about the investigation he undertook in deciding the type of expert witness to call. We will not second-guess trial counsel's strategic decisions. *See Morris v. State*, No. W2022-00208-CCA-R3-PC, 2023 WL 2733503, at *38 (Tenn. Crim. App. Mar. 31, 2023) (citing *Granderson*, 197 S.W.3d at 790), *no perm. app. filed*.

In order to receive post-conviction relief for ineffective assistance of counsel, Petitioner had to prove that counsel's alleged error in not calling a use-of-force expert "fell below an objective standard of reasonableness" and that counsel's deficiency prejudiced Petitioner's defense. *Strickland*, 466 U.S. at 687; *Phillips*, 647 S.W.3d at 401. Petitioner failed to prove both the deficient performance prong and the prejudice prong of *Strickland*.

## Conclusion

A petitioner seeking post-conviction relief has "the burden of proving the allegations of fact by clear and convincing evidence." Tenn. Code Ann. § 40-30-110(f); *Dellinger*, 279 S.W.3d at 291. Because Petitioner has failed to prove both prongs necessary to satisfy *Strickland*, we conclude that Petitioner cannot prevail on his claim for ineffective assistance of counsel. The judgment of the post-conviction court denying relief is affirmed.

s/*Robert L. Holloway, Jr.*
ROBERT L. HOLLOWAY, JR., JUDGE

- 11 -