IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 21, 2015 Session

## BRANDON MOBLEY v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Knox County**
**No. 89072    Bob R. McGee, Judge**

_____

### No. E2014-00481-CCA-R3-PC – Filed May 21, 2015

_____

The Petitioner, Brandon Mobley, appeals as of right from the Knox County Criminal Court's dismissal of his petition for post-conviction relief. The Petitioner contends that he received ineffective assistance of counsel when his trial counsel allowed a stun belt to be placed on the Petitioner without a hearing or any evidence from the State that use of the stun belt served a legimate necessity. Specifically, the Petitioner argues that wearing the stun belt forced him to testify against his will, affected his demeanor while testifying, impeded his ability to communicate with trial counsel, and "imparied his ability to take an active interest in the presentation of his case." Following our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Wade V. Davies, Knoxville, Tennessee (at post-conviction hearing and on appeal), and George C. Shields, II, Knoxville, Tennessee (on appeal) for the Appellant, Brandon Mobley.

Herbert H. Slatery III, Attorney General and Reporter; Leslie E. Price, Senior Counsel; Charme P. Allen, District Attorney General; and Ta'Kisha Fitzgerald, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

PROCEDURAL AND FACTUAL BACKGROUND

*I. Procedural History*

This case comes before us with a complex procedural history. The Petitioner was convicted in 2005 of two counts of premeditated first degree murder and one count each of especially aggravated robbery and setting fire to personal property. The Petitioner received an effective sentence of two consecutive life sentences plus twenty-two years for these convictions. On direct appeal, a panel of this court affirmed the Petitioner's convictions but reduced his total effective sentence to two consecutive life sentences plus nineteen years. State v. Brandon Mobley, No. E2006-00469-CCA-R3-CD, 2007 WL 1670195 (Tenn. Crim. App. June 11, 2007), perm. app. denied (Tenn. Sept. 24, 2007). Our supreme court declined to review this court's decision.

The Petitioner filed a timely pro se petition for post-conviction relief. Afterwards, counsel was appointed and two amended petitions were filed. Following an evidentiary hearing, the post-conviction court issued a written order dismissing the petition. On appeal, a panel of this court reversed the post-conviction court's dismissal of the petition, holding that trial counsel was ineffective "concerning the use of expert testimony," and remanded the case for a new trial. Brandon Mobley v. State, No. E2010-00379-CCA-R3-PC, 2011 WL 3652535 (Tenn. Crim. App. Aug. 18, 2011), rev'd, Mobley v. State, 397 S.W.3d 70 (Tenn. 2013).

Our supreme court granted permission to appeal, reversed this court's judgment, and affirmed "the judgment of the post-conviction court with regard to the ineffective assistance of counsel claim based on trial counsel's failure to elicit a specific opinion from the defense's mental health expert." Mobley, 397 S.W.3d at 76. However, our supreme court reversed "the judgment of the lower courts denying the ineffective assistance of counsel claim relating to trial counsel's failure to object to the use of a stun belt during the trial." Id.

Given the lack of evidence regarding the stun belt issue in the original post-conviction record, the supreme court remanded the case back to the post-conviction court for a new evidentiary hearing solely on that issue and instructed the post-conviction court to address the following:

> (1) the circumstances surrounding the decision to require [the Petitioner] to wear a stun belt at his trial, (2) whether [the Petitioner's] trial counsel's performance was deficient with regard to the decision to require [the Petitioner] to wear a stun belt, (3) whether requiring [the Petitioner] to wear a stun belt at trial had an adverse effect on his demeanor or his ability to testify at trial, and (4) whether the adverse effect, if any, was sufficient to undermine confidence in the outcome of [the Petitioner's] trial.

Mobley, 397 S.W.3d at 103.

The post-conviction court held a second evidentiary hearing on March 7, 2014. At the conclusion of the hearing, the post-conviction court again dismissed the petition. This appeal followed.

*II. Factual Background Regarding the Petitioner's Convictions*

The evidence at trial established that on May 26, 2003, at the age of sixteen, the Petitioner shot and killed the victims, Joshua Nance and Oshalique Hoffman, while they were sitting in Ms. Hoffman's blue Buick. Mobley, 2007 WL 1670195, at *1. That day, Mr. Nance received a phone call and left his grandmother's house with Ms. Hoffman in her car to meet the Petitioner. Jamesena Thompson testified that she lived across the street from the Petitioner and that, on the day of the murders, she "heard tires squealing" and saw the Petitioner driving away in Ms. Hoffman's car. Ms. Thompson testified that the Petitioner ran two stop signs, "nodded" to her when he saw her, "and then appeared to be leaning over adjusting" the radio. Id.

Ms. Thompson also testified that Ms. Hoffman was very protective of her car and would not have let the Petitioner drive it. Mobley, 2007 WL 1670195, at *1. Suspicious about the Petitioner's driving Ms. Hoffman's car, Ms. Thompson ran to the parking lot where the car had come from. Ms. Thompson found Ms. Hoffman's body lying on the ground with a revolver next to it. The revolver contained "two spent cartridges and four unspent cartridges." Id. at *2. A fingerprint from the Petitioner was found on the gun, as well as Ms. Hoffman's blood. Id. at *2, 4. Later, ballistics testing revealed that the bullets that killed Mr. Nance and Ms. Hoffman had been fired from the revolver. Id. at *4.

The Petitioner was next seen at the home of his ex-girlfriend, Jada Byrge. Mobley, 2007 WL 1670195, at *2. Ms. Byrge's sister, Tabith Robinson, testified that the Petitioner told her "he had just been in a car accident" and asked her "for a bowl of water and some towels" to clean Ms. Hoffman's car. The Petitioner also asked her for a phonebook and a phone so he could call Po-Boys Tires to inquire about selling the rims on Ms. Hoffman's car. However, the store was closed because it was Memorial Day. Ms. Robinson recalled that while the Petitioner was on the phone, he was counting a "wad" of money. Ms. Robinson also testified that she helped the Petitioner clean the car until she saw blood and brain matter on the dashboard. Id.

Ms. Robinson alerted her mother to what she had found, and her mother confronted the Petitioner. Mobley, 2007 WL 1670195, at *2. The Petitioner claimed that "it was spit." At that point, several of the Petitioner's friends "drove up in a green Jeep, and they all left." Id. Robert Dean Wilson, Jr., testified that he and two other men were in the Jeep and that when they arrived at Ms. Byrge's house, the Petitioner told them "he had stolen a car, and he wanted them to follow him." Id. at *3. Mr. Wilson testified that

-3-

they followed the Petitioner "until he pulled into a gravel road." At that point, Mr. Wilson could not see the Petitioner or Ms. Hoffman's car. The Petitioner got into the Jeep a few minutes later and asked the men to take him to a motel. Id.

Mr. Wilson testified that when the Petitioner got into the Jeep, he noticed blood on the Petitioner's clothes and shoes. Mobley, 2007 WL 1670195, at *3. Mr. Wilson also testified that the Petitioner started counting money while he sat in the back of the Jeep and that he estimated the money to total $1,500. According to Mr. Wilson, the Petitioner told the men that he had attempted to buy drugs from the victims but that Mr. Nance threatened to kill him if he did not pay back money he owed to Mr. Nance. The Petitioner told the men that Mr. Nance pulled out a gun and that he "reacted" and shot Ms. Hoffman, then Mr. Nance. The Petitioner said that "he pushed [Ms.] Hoffman out of the car and dumped [Mr.] Nance's body behind a church." Mr. Wilson testified that he stayed with the Petitioner at a motel room for a brief time, during which he saw the Petitioner "take off his shoes and tie them up in a motel trash bag" and make a number of phone calls. Id.

Ms. Byrge testified that she received a phone call from the Petitioner that afternoon and that he denied doing anything and "seemed as though nothing bothered him." Mobley, 2007 WL 1670195, at *2. The Petitioner was arrested later that day after attempting to flee the motel room. Id. at *4. Mr. Nance's body was eventually discovered in a secluded area behind a church during the early morning hours of May 27, 2003. Id. at *5. Ms. Hoffman's car was found burning near a farm. Mr. Nance's phone was found by the car, and the last call made from the phone was to the Petitioner's mother "at 1:41 p.m., but the shooting took place around 1:25 or 1:30 p.m." Id. The medical examiner testified at trial that Mr. Nance "appeared not to have died instantly, instead living up to four hours after he was shot." Id. at *4. Both Mr. Wilson and Ms. Byrge testified that the Petitioner regularly carried a gun "out in the open." Id. at *2-3. Ms. Byrge testified that the Petitioner purchased a gun approximately two weeks before the shooting and test fired it at her house. Id. at *2.

The Petitioner testified in his own defense at trial. Mobley, 2007 WL 1670195, at *5-6. The Petitioner claimed that he had purchased $2,000 worth of cocaine from Mr. Nance on credit two weeks before the shooting. Id. at *5. According to the Petitioner, on the day of the murders, he received a phone call from Mr. Nance. The Petitioner alleged that Mr. Nance threatened him if he did not pay back the money he owed and insisted on meeting him. The Petitioner testified that he took a gun with him to the meeting because he had carried a gun whenever he went out after having been robbed a few weeks before. The Petitioner claimed that he planned to give Mr. Nance $400 and the cocaine that he had been unable to sell. Id.

The Petitioner testified that Mr. Nance and Ms. Hoffman arrived in Ms. Hoffman's Buick and that Mr. Nance insisted that the Petitioner get in the back seat of the car even though he did not want to. Mobley, 2007 WL 1670195, at *5. The Petitioner claimed that Mr. Nance rejected his offer to return the drugs and threatened to kill him "if he did not come up with the $2,000." Id. at *6. The Petitioner testified that Mr. Nance then pulled out a gun. The Petitioner said that he "reacted" by shooting Mr. Nance in the head. The Petitioner claimed that he saw Ms. Hoffman "duck" and that he thought she was reaching for a weapon, so he shot her as well. Id.

The Petitioner testified that he panicked, removed Ms. Hoffman's body from the car, and drove away. Mobley, 2007 WL 1670195, at *6. The Petitioner claimed that he was so panicked that he did not realize that he had dropped his gun beside Ms. Hoffman's body or that Mr. Nance was still in the car. According to the Petitioner, he threw Mr. Nance's gun "out the window as he was going across a bridge." The Petitioner drove to the church "where he planned on running into the woods, but he instead decided to push [Mr.] Nance's body down a hill." The Petitioner testified that he then drove to Ms. Byrge's house, but he denied calling Po-Boys Tires and attempting to sell the rims from Ms. Hoffman's car. Id.

The Petitioner admitted to calling one of his friends while he was at Ms. Byrge's house. Mobley, 2007 WL 1670195, at *6. The Petitioner testified that when his friends arrived in the Jeep, they followed him. The Petitioner admitted that he set Ms. Hoffman's car on fire. Afterwards, he had his friends take him to a motel room in a different part of town. The Petitioner claimed that while he was in the motel room, he was given a different pair of shoes by one of his friends and changed his shoes. The Petitioner also claimed that he flushed the cocaine down the toilet and gave some of the money away while throwing the rest of it in the trash. The Petitioner denied that he was attempting to flee the police when he left the motel room. Id.

After the Petitioner testified, Doctor Pam Auble testified on his behalf.[1] Mobley, 2007 WL 1670195, at *7. Dr. Auble opined that the Petitioner suffered from "major depression, attention deficit hyperactivity disorder, oppositional defiant disorder, and low intellectual functioning." Dr. Auble further opined that the Petitioner was "quick to perceive people as hostile" and "would respond impulsively, without thinking" when threatened. Dr. Auble testified that all this "would have affected [the Petitioner's] mental state at the time of the killings." On cross-examination, Dr. Auble admitted that the Petitioner had told her that Ms. Hoffman had pulled the gun on him and that he shot her

---

[1] Initially, the trial court erroneously ruled that Dr. Auble's testimony was inadmissible, but after the Petitioner testified, the State withdrew its objection and Dr. Auble was allowed to testify. See Mobley, 397 S.W.3d at 77-78, 81-88.

first. Dr. Auble further admitted "that if that was inaccurate, that could potentially alter her analysis." Id.

The jury ultimately rejected the Petitioner's claims of self-defense and that he was not mentally capable of acting with intent or premeditation, and convicted the Petitioner of two counts of premeditated first degree murder and one count each of especially aggravated robbery and setting fire to personal property. Mobley, 2007 WL 1670195, at *8. On direct appeal to this court, the Petitioner challenged the sufficiency of the evidence for his first degree murder and especially aggravated robbery convictions, challenged his sentences, and alleged that the trial court erred by initially prohibiting Dr. Auble from testifying, which forced the Petitioner to testify against his will. Id. at *1. In rejecting the Petitioner's claim regarding Dr. Auble, this court's opinion stated that there was "nothing in the record to indicate that the [Petitioner] ever expressed reservation about testifying, or that he testified only because Dr. Auble's proposed testimony had initially been excluded." Id. at *14.

### III. Evidence From the Petitioner's Trial Regarding the Stun Belt[2]

#### A. Decision to Use Stun Belt

On the day that the Petitioner's trial was scheduled to begin, the court officer approached trial counsel during a preliminary conference and told him that he needed to talk to the Petitioner. The court officer stated that the Petitioner was "not wanting to change clothes" because "[h]e thinks it's not going to trial." The trial court took a brief recess during which trial counsel went back to the holding area to speak to the Petitioner. When he returned, trial counsel informed the trial court that they "probably need[ed] to bring [the Petitioner] out and let him address the Court."

The Petitioner entered the courtroom and made the following statement to the trial court:

> . . . Me and my lawyer's been incompatible for about eight or nine months now. We got a conflict of interest. He's failed to prepare my defense properly in a timely fashion within the time to prepare my case, Your Honor, and I would appreciate if I be appointed a new lawyer because he's ineffective.

---

[2] In remanding this case back to the post-conviction court, our supreme court urged the post-conviction court to "examine the trial record in detail" to evaluate the Petitioner's claim "in light of anything in the trial record tending to support or detract from [the Petitioner's] allegation." Mobley, 397 S.W.3d at 102. As such, we will discuss the evidence from the trial record, as well as from the original post-conviction proceedings, regarding the stun belt issue before discussing the evidence from the second post-conviction hearing.

He has not been effective from day one. The past arguments that we've gotten into the words were so serious that only a man would hold a grudge from them -- anybody would hold a grudge from them. I can't put my trust in somebody that's holding a grudge against me, and he -- I don't know anything about my defense. I don't know nothing about my case, because he's failed to come and see me. He's failed to answer his phone and return phone calls. So I just can't -- there's no way I would be able to attend this trial today or take the stand in this case as long as I'm forced to go to trial with this man.

Trial counsel represented to the trial court that, according to his records, he had met with the Petitioner twenty-one times to discuss the Petitioner's case. Trial counsel said that the State had provided open discovery and that he had "gone over in detail" with the Petitioner "[e]very bit of that" and had provided the Petitioner with copies of "everything relevant to this case." Trial counsel stated that there had "been no meetings of any animosity" between himself and the Petitioner. Trial counsel further stated that he and his investigator, Barry Rice, had a "lengthy meeting" with the Petitioner the previous Friday and that "none of this came" out.

Trial counsel then made the following statement:

Judge, you know it'd be awful easy for me to stand here and tell you that I've got a conflict in a difficult case like this, but, in all candor, I don't. This case is ready for trial. [The Petitioner] has been prepared for over a year as everything developed in this case, and that's the way I stand on it. And I've also tried to keep [the State] advised.

Several weeks ago [the Petitioner] raised some questions. I went and talked to [the prosecutor] about it. We had further meetings, things leveled out, and [there] haven't been any problem[s] since.

The trial court asked trial counsel directly if "communication between the [Petitioner] and the attorney [had been] destroyed." Trial counsel responded that, as of their last meeting, their communication had not broken down. Trial counsel reiterated that it "was a very good meeting" and that they had "discussed every aspect of this case, his testimony and any late developments in it." (Emphasis added). The trial court asked the Petitioner to respond, and he made the following statement:

Sir, he -- all I can say about that is I told him eight or nine months ago to address the Court or come time I get a chance to address the Court I will. I come to court to get took to my momma's funeral, February 23rd. He failed to tell you then so that's why I'm telling you now. I told him I

-7-

was going to regardless of what he said today or how many times he come to see me and -- or do whatever because that don't change the fact that we've had a conflict from the past. He's trying to cover something up. I don't know what it is, but I can't work with him. It's as simple as that.

The trial court sought to clarify the Petitioner's complaint and asked if it was "because you can't work with him, or you won't . . . work with him?" The Petitioner responded as follows:

It's not because I don't want to, but I do. I want to go on and proceed with this and get this out of my way, but this man's failed to prepare my defense in a timely fashion, and for my knowledge, I know nothing of the defense. All I know is this man come to me talking about you got to get on the stand. He ain't said, well, they brought this and said you're going to be getting this much time or if it get dropped that is because of a technical difficulty or anything. He's not bring any of this to me, and I've got proof of how many times he's come up there to see me and how little contact I've had with him; and, in my opinion, I don't feel that this -- if it was enough time that he spent to come see me and go over my case.

There's been time when I called this man, and I won't see him for three or four months later, and that's only in the courtroom. I say why don't you come and see me. You know he fails to come up and see me. I don't see him for another three or four months, and I need more out of a lawyer than what he's proceeding.

After the Petitioner's statement, the trial court had trial counsel's investigator brought into the courtroom, sworn in, and questioned by the prosecutor. Mr. Rice testified that he had met with the Petitioner "[m]any times" in the jail and reiterated what trial counsel had said about their last meeting with the Petitioner. Mr. Rice testified that the meeting "was long" and that they "prepared for trial" by discussing the case, "the witness statements, [and] the evidence against" the Petitioner. Mr. Rice further testified that he and trial counsel had "gone over" the evidence with the Petitioner "as [they] discovered it and in its entirety several times."

Mr. Rice testified that at a meeting a few weeks before trial, the Petitioner "was upset." The Petitioner complained that trial counsel "didn't do everything that he thought he could do to prepare for the case." Mr. Rice testified that when they asked the Petitioner what more they could have done, the Petitioner "just said that he wasn't happy with" trial counsel. Mr. Rice believed that part of the reason the Petitioner was upset was that he "wasn't happy with what [trial counsel] reported that [the] witnesses were going to say." Mr. Rice was then questioned by trial counsel. Mr. Rice testified that in addition

to providing the Petitioner with copies of the discovery materials, he had recently delivered copies of the witness statements to the Petitioner. The Petitioner wanted to review the witness statements again but had mailed the original discovery packet to his mother and it had been lost.

At the conclusion of Mr. Rice's testimony, the trial court denied the Petitioner's motion for appointment of new counsel and concluded that there was "no disintegration of communication between the [Petitioner] and the attorney," but rather that the Petitioner had raised the issue in an attempt to delay the trial. The trial court then warned the Petitioner that it was "foolish not to take advantage of" the "street clothes" trial counsel had provided for him. The trial court further admonished the Petitioner that if there was "any attempt on your part to disturb the proceedings of this Court or any other court, the Court has the power of contempt and along with that contempt can order you placed under chains, gagged, and brought into the courtroom before the jury . . . ." The trial court also threatened the Petitioner that if he continued "disturbing the proceedings of this Court," he would be tried in absentia. The trial court then recessed to allow the Petitioner and trial counsel time to confer.

At the conclusion of the recess, trial counsel informed the court that the Petitioner would "not come back out" and said that "he wanted to go down to his cell[, that] [h]e wouldn't participate." Trial counsel stated that he asked the Petitioner twice to reconsider his decision, but the Petitioner refused. The trial court, the prosecutor, and trial counsel then had a lengthy discussion about the procedure for trying a defendant in absentia. At one point during the discussion, the trial court asked the attorneys to approach for a bench conference. During the conference, the following exchange occurred:

> [Court officer]: Of course, he'll probably come out here. If I tell him he needs to come out here to put this stuff on the record, he'll come out for that because that's how I got him the last time, telling him that if he was going to try to fire his attorney it had to be on the record, and he was agreeable to that. But then once it reaches the other point, he's just going to turn and walk out, I'm afraid. Okay? Now, my suggestion is that we can put the shock belt on him, and then that way he'll know if he starts acting up --
>
> [Trial court]: That's all right.
>
> [Trial counsel]: That's not a bad idea, I mean, at this point.
>
> [Court officer]: I mean that's only an idea.

[Trial court]: Okay.

After that exchange, the prosecutor redirected the conversation back to the procedures for trying a defendant in absentia. The trial court then took a recess for lunch. At the conclusion of the recess, the trial court and the attorneys engaged in another lengthy discussion regarding the procedures for trying a defendant in absentia. At the conclusion of this discussion, the Petitioner was brought into the courtroom, and the trial court addressed him. There is nothing in the record as to whether the Petitioner had been placed in the stun belt at that time. The trial court went through a detailed explanation of the Petitioner's trial rights and what rights he would be waiving if he were tried in absentia.

During that explanation, the trial court informed the Petitioner that he had the right to testify on his own behalf and that the decision whether to testify was "completely" his. The trial court advised the Petitioner that the advice of trial counsel was "very, very important" in making his decision. The trial court then explained that if the Petitioner did not want to testify, he could "remain silent," and reiterated that the decision was his "alone." The trial court also reiterated that the Petitioner had "the right to have" trial counsel's advice about the decision and that he should consider trial counsel's advice because trial counsel had "been through this process more times than" the Petitioner.

The trial court then asked the Petitioner if he felt that he "could allow the trial to go forward without [his] presence." The Petitioner responded: "No, sir. That's why I'm ready to get my -- my street clothes on . . . get these cuffs and everything [off] and get this thing on the road . . . before we waste any more of the Court's time." The trial court then asked the Petitioner if he understood what it "said earlier about any probable or possible disturbance in the courtroom," and the Petitioner responded, "Yes, sir, I do." The trial court then warned the Petitioner that if there were any disturbances, "that will be carried out." The trial court then recessed to allow the Petitioner to change his clothing.

*B. Testimony of Witnesses Other Than the Petitioner*

As pertinent to our review, Jamesena Thompson testified that Ms. Hoffman's car was "two-tone[d]," beige and dark brown. However, the evidence at trial established that Ms. Hoffman's car was actually blue. Trial counsel did not question Ms. Thompson about this inconsistency during cross-examination. At no point during Ms. Thompson's testimony does the record reflect that there were any outbursts or disruptions in the proceedings.

Also pertinent to our review, Robert Dean Wilson, Jr., testified that while he was at the motel room, the Petitioner "took his shoes off and threw them in the trash." Mr. Wilson testified that he only stayed at the motel room for five or ten minutes and left

-10-

before the Petitioner was arrested. On cross-examination, Mr. Wilson clarified that he did not see the Petitioner throw the shoes in a trash can. Rather, the Petitioner "put them in a clear trash bag out of a motel trash can" and tied the bag "in a knot." Mr. Wilson testified that the shoes and the bag were still "sitting in the room" when he left.

## C. The Petitioner's Testimony

After the trial court ruled Dr. Auble's testimony inadmissible, the Petitioner was called as a witness. The following exchange then occurred:

> [Trial court]: Okay. And we might as well go through a <u>Momon</u> hearing[3] now. Have you discussed this case with the [Petitioner], and he knows that <u>he does not have to testify if he doesn't want to</u>. Have you explained that to him?
>
> [Trial counsel]: I have, Your Honor.
>
> [Trial court]: And you see this <u>Momon</u> case is a little strange because the Court cannot talk to the [Petitioner] directly because there is some possibility of influence. All right. He -- he understands that?
>
> [Trial counsel]: He does, Judge.
>
> [Trial court]: And that if he wants to, no one can keep him from testifying; or <u>if he doesn't want to, no one can force him to testify</u>. You understand that?
>
> [Trial counsel]: Are you -- are you asking him?
>
> [Trial court]: No, I'm asking you.
>
> [Trial counsel]: Judge, he does understand that.
>
> [Trial court]: And I think the [s]upreme [c]ourt short-circuited the trial courts, and he -- he does this on his own free will?
>
> [Trial counsel]: We've discussed it at length, Judge, and he understands it.

---

[3] The trial court was referring to the prophylactic procedure outlined in <u>Momon v. State</u>, 18 S.W.3d 152 (Tenn. 1999), and designed to insure that a defendant's waiver of his right to testify is voluntary, knowing, and intelligent. <u>See</u> <u>Mobley</u>, 397 S.W.3d at 90-91. However, said procedure was not required prior to the Petitioner's testimony as our supreme court has "respectfully decline[d] to extend the reach of the prophylactic procedure in <u>Momon</u> to instances in which a criminal defendant elects to testify." <u>Id.</u> at 90.

[Trial court]: All right. All right. As long as he understands.

(Footnote and emphasis added).

After a brief recess, the Petitioner testified. As pertinent to this review, the Petitioner testified that Mr. Nance pulled a gun on him and that he shot Mr. Nance and then Ms. Hoffman after he saw Ms. Hoffman "duck." On cross-examination, the Petitioner was asked about a number of phone calls made to Mr. Nance's cell phone from the Petitioner's mother's cell phone prior to the shooting. The Petitioner stated that he did not recall making any of the phone calls and denied doing so. When asked who, other than himself, at his house would call Mr. Nance, the Petitioner responded, "Who knows. A lot of people in my house sold drugs." Upon further questioning, the Petitioner denied calling Mr. Nance at all the afternoon of the shooting and suggested that his mother's boyfriend had been the one to make the phone calls.

The Petitioner also claimed that Mr. Nance had called him to arrange their meeting around 11:00 a.m., despite the fact that the shooting occurred at approximately 1:25 p.m. When the prosecutor confronted the Petitioner with the fact that there was no phone call from Mr. Nance's phone to the Petitioner's mother's phone in the records, the Petitioner responded as follows: "I can't explain that. You would have to go through the company to ask that. Maybe a mess up in the system. I don't know." When the prosecutor implied that the Petitioner knew Mr. Nance well, the Petitioner denied it, saying that he had "met" Mr. Nance but that he had "not been hanging around him." The Petitioner also contradicted the prosecutor when she asked, "But [Mr. Nance] didn't threaten you?" The Petitioner responded that Mr. Nance did threaten him and elaborated as follows: "He didn't say he would kill me. He just told me there would be problems."

When the prosecutor "assum[ed] music [was] on" because Ms. Hoffman's car was running, the Petitioner disagreed and testified that the radio was not on while he was in the car. The Petitioner also disagreed with the prosecutor's description of his testimony regarding how Mr. Nance was holding the gun he claimed Mr. Nance had threatened him with. When the prosecutor said that the Petitioner had "drug" Ms. Hoffman's body out of the car, the Petitioner objected to the use of the term "drug" and said he "pulled her out" of the car. The Petitioner also denied that he waived at Ms. Thompson as he drove away. The Petitioner testified that he "just put [his] hand up while [he] was driving." The Petitioner also denied "messing with the radio" as he was driving past Ms. Thompson.

When the prosecutor insinuated that the Petitioner made sure not to run over Ms. Hoffman's body, the Petitioner contradicted her and said that he "was not paying any attention to anything like that." The Petitioner also denied, when asked by the prosecutor, that Mr. Nance was still alive and breathing before the Petitioner left him in a secluded area. In describing how the Petitioner got Mr. Nance from the car to the area

behind the church, the prosecutor asked the Petitioner, "And you go through his pockets?" The Petitioner denied going through Mr. Nance's pockets. When asked where he got the $1,500 he was seen with, the Petitioner denied having $1,500 on him the day of the murder. The Petitioner was also asked about a series of phone calls made between 1:34 p.m. and 1:41 p.m. from Mr. Nance's phone to the Petitioner's mother's phone. The Petitioner denied making any of those calls and testified that he had no "idea who would have done that."

The prosecutor stated that the Petitioner "didn't have any concern for young [Ms. Robinson] who was helping [him] clean the car out." The Petitioner contradicted the prosecutor and testified that he told Ms. Robinson "to stay away from the car." The Petitioner also denied that Ms. Robinson brought him a phone book or that he called Po-Boys Tires to inquire about selling the rims on Ms. Hoffman's car. The Petitioner admitted that when his friends arrived, he was smoking a "blunt" but denied he had taken it from Mr. Nance. The Petitioner also denied that he had stolen cars in the past with one of his friends or had taken other stolen cars to the location where he set Ms. Hoffman's car on fire.

The prosecutor asked the Petitioner if, after he had put a rag in the gas tank of Ms. Hoffman's car and lit it, he "jumped in the" Jeep and told his friends that he had blown "that car sky high." The Petitioner denied ever saying that. The Petitioner also denied telling his friends that he would "rather have twelve people judging [him] instead of six people carrying [him]." The Petitioner testified that he did not remember calling Ms. Byrge after the shooting. The Petitioner also denied test firing the murder weapon at Ms. Byrge's house or buying it two weeks before the murders. The Petitioner claimed that he had the murder weapon "way before that."

When the prosecutor implied that the Petitioner went to the motel "to hide out," the Petitioner denied that. The Petitioner also denied that he called members of his family while he was at the motel room. The prosecutor asked the Petitioner if he threw his "bloody shoes" in the trash can in his motel room; the Petitioner denied throwing away his shoes and claimed that one of his friends, Brandon Walden, had thrown them away. The prosecutor also asked the Petitioner if he had ever told anyone that "Mr. Nance pulled out a gun and [he] pulled out [his] gun and shot Ms. Hoffman in the back of the head, and then [he] shot Mr. Nance?" The Petitioner denied ever telling anyone that he shot Ms. Hoffman first.

At his sentencing hearing, the Petitioner testified that he knew Mr. Nance "very well." The Petitioner testified that he did "not really" know Ms. Hoffman and had only met her one time before the murders. However, he later testified that knew Ms. Hoffman and that she "was a good girl." Trial counsel asked the Petitioner if they had "talked about this case quite a bit," and the Petitioner responded, "Yes, sir." Trial counsel then

-13-

asked the Petitioner if he remembered talking to trial counsel about how he "felt about what happened," and the Petitioner responded, "Yes, sir."

*IV. Evidence From the Petitioner's Original Post-Conviction Hearing Regarding the Stun Belt*

At the post-conviction hearing, trial counsel testified that he did not recall the Petitioner's ever threatening him. Trial counsel further testified that he "had no reason to have hostile feelings toward" the Petitioner and that he did not think the Petitioner had any towards him. Trial counsel recalled that a few weeks before trial, he had a meeting with the Petitioner that "was not too productive." Trial counsel testified that as a result of that meeting he sent a letter to the Petitioner. The letter, dated approximately two weeks before the Petitioner's trial began, was entered as an exhibit to the post-conviction hearing.

The letter stated that when the Petitioner, trial counsel, and his investigator "last met," the Petitioner "did not wish to discuss [the] case or [his] trial, stating there was a conflict." Trial counsel stated that he had represented the Petitioner for "one year now with no conflict" and that there was not one at that time. The letter further stated that trial counsel had "reviewed every aspect of [the] case with [the Petitioner] over the past year" and that the Petitioner had been furnished the "indictment, witness statements, forensic results, autopsy reports, police reports, pleadings filed and other pertinent documents." The letter then stated that trial counsel had provided the Petitioner "with extensive discovery material" and outlined the evidence against the Petitioner.

The letter continued, stating that the evidence was "compelling and strong" and that there was "little chance that anyone would believe" that the Petitioner did not shoot the victims. Trial counsel then outlined three possible defenses to the case. The first was that the Petitioner "did not do it." The second was that the Petitioner could "not remember what happened" and could not "explain why it happened." The third defense was stated as follows:

> As you have told us, you feared for your life after they threatened to kill you over the money you owed them and Hoffman pulled a gun on you and you fired in self[-]defense; that you did not walk down to meet them with any intention of robbing or killing them. No matter what you may have been told or may believe, self[-]defense is and has always been a defense in Tennessee. Your mental state at the time can be well explained and supported by Dr. Auble.

(Emphasis added).

-14-

After reviewing the possible defenses, the letter stated as follows:

> As we have discussed, you do not have to testify in this case; you are, however, the only person who can explain what happened, why, and that you feared for your life. You are also the person who can best explain the circumstances in your life in the sentencing phase, if necessary.

Trial counsel testified that he remembered "going over with [the Petitioner] what his testimony would be if he testified at trial." Trial counsel elaborated that "from practically the first time [he] ever met with" the Petitioner, he "went over" with the Petitioner "about what he would have to do and what his testimony would be, what he could expect on cross[-examination]." Trial counsel further testified that he did not instruct the Petitioner to testify but that he left the decision whether to testify to the Petitioner. Trial counsel also testified that he gave the Petitioner copies of "witness statements, police reports, [the] autopsy report," and other documents provided during discovery. Trial counsel testified that the Petitioner lost those documents prior to trial because he "sent them to his mother." Trial counsel recalled that he reviewed the phone records used during the State's cross-examination with the Petitioner prior to trial and denied ever telling the Petitioner that those records would be inadmissible at trial.

Trial counsel testified that after the unproductive meeting, he and the Petitioner "resolved that issue, and after that everything was fine, [they] didn't have any other problems." Trial counsel recalled that he had four meetings with the Petitioner after that, that those meetings were all productive, and that there were "no problems." Specifically, trial counsel recalled that the Friday before trial, he and his investigator met with the Petitioner for two and a half hours and "had a good meeting with him." Trial counsel testified that he could not recall the Petitioner's ever requesting that "a new lawyer be appointed." Trial counsel did recall that the Petitioner "did not want to come out, and did not want to proceed with trial" the first day.

Trial counsel testified that he could not remember what he said to the Petitioner when he met with him in the holding area before trial. Trial counsel further testified that he did not "recall ever discussing" the stun belt with the Petitioner. Trial counsel explained that he did not think that the Petitioner "was going to act out in court" but that he "didn't think [the stun belt] would make much difference to" the Petitioner. Trial counsel further explained that since the jury could not see the stun belt, he "didn't think it made much difference one way or the other." Trial counsel testified that "once the trial got started, [the Petitioner] was just like he'd always been, there weren't any problems." Trial counsel further testified that the Petitioner "paid close attention" to the trial. Trial counsel said that he did not recall the Petitioner's ever trying to talk to him while any of the witnesses were testifying or telling the Petitioner to stop talking during the testimony of any of the witnesses.

-15-

Trial counsel reiterated that the Petitioner "didn't have a whole lot to lose by testifying," given that the "evidence in this case was so compelling," but that it was the Petitioner who "made the decision to testify." Trial counsel testified that the Petitioner's testimony was consistent with their discussion of the facts prior to trial. Trial counsel further testified that he felt Dr. Auble "could probably overcome [the] discrepancy" between the facts in her report and the Petitioner's testimony about which victim had the gun and was shot first. Trial counsel said that he did not think the discrepancy "made a significant difference" in this case and that he was willing to risk introducing that discrepancy to get the rest of Dr. Auble's testimony before the jury because "intent was the key issue in the case."

The Petitioner testified that trial counsel only met with him five or six times rather than the twenty-one meetings reflected in trial counsel's records. The Petitioner claimed that at his third meeting with trial counsel, he was "frustrated . . . because [he] couldn't get in contact" with trial counsel. The Petitioner testified that he "cursed [trial counsel] out" and told trial counsel that he "didn't want [trial counsel] working on [his] case [any] more." The Petitioner claimed that he "didn't trust [trial counsel any] more after that" and "wanted [trial counsel] off [his] case." The Petitioner denied ever receiving the letter from trial counsel regarding what trial counsel referred to as their "not too productive" meeting.

The Petitioner claimed that trial counsel never told him what their "theory of defense" would be at trial. The Petitioner further claimed that trial counsel never prepared him to testify. The Petitioner alleged that because of this, at the start of his trial, he did not intend to testify and told trial counsel that he would not testify. According to the Petitioner, he only decided to testify after the trial court ruled Dr. Auble's testimony inadmissible. The Petitioner claimed that trial counsel told him that the trial would end immediately and that he would "automatically be found guilty" if he did not testify. The Petitioner further explained, "I mean, once [trial counsel] told me that I would automatically be found guilty, you know, my mind was set, you know, well, I really don't have no [sic.] choice." In explaining his decision to testify, the Petitioner made no mention of the stun belt.

Later in the post-conviction hearing, the Petitioner was asked about the incident at the start of the trial. The Petitioner explained that he thought if he refused "to dress out" the trial court would see that he and trial counsel "had a torn relationship" and "would give [him] a new lawyer." The Petitioner testified that after that incident, "a heavier white guy" dressed in all black showed him the stun belt and demonstrated it for him. The Petitioner claimed that the device was a "box" that was strapped to his leg. The Petitioner further claimed that he was wearing the device when he told the trial court that he wanted to be present for his trial and before he changed into his "street clothes." The

Petitioner testified that he never talked to trial counsel about the stun belt and that trial counsel never objected to the use of the stun belt.

The Petitioner further claimed that he was wearing the stun belt when he testified at trial. The Petitioner was asked if the stun belt was "on [his] mind" when he testified, and the following exchange occurred:

[The Petitioner]: It was since they put it on me after he showed me what it done.

[Post-conviction Counsel]: Do you think it interfered with your ability to testify?

[The Petitioner]: I mean, that and a lot of other things that contributed to that.

[Post-conviction Counsel]: What were some of the other things?

[The Petitioner]: I mean, I didn't trust my lawyer. I mean, I wasn't prepared. You know, I didn't know what, you know, the -- I guess you would say the ramifications of testifying, you know, what to expect.

The Petitioner testified that all of his testimony at trial was truthful and that he testified consistently with what he had told trial counsel prior to trial.

The Petitioner also complained about how trial counsel had cross-examined Mr. Wilson during the trial. The Petitioner testified that he was given all of the witness statements before trial and that he had reviewed them all, including Mr. Wilson's statement. The Petitioner claimed that Mr. Wilson had lied during his testimony about the location of the Petitioner's shoes. Mr. Wilson testified that the shoes were "tied up in a trash bag," but the Petitioner claimed that Mr. Wilson told the police that the shoes were "in a trashcan at the end of the motel." The Petitioner further claimed that Mr. Wilson's "reason to testify against [him] was because [Mr. Wilson] was the one that threw the shoes away."

Ms. Hoffman's father, Kevin Hoffman, testified at the post-conviction hearing. Mr. Hoffman testified that during the trial, he saw the Petitioner "act up in court." Mr. Hoffman testified that the Petitioner repeatedly winked at him and said to him, "Watcha gonna do." Two witnesses from the Knox County Sheriff's Office testified at the post-conviction hearing that stun belts were not in use at the time of the Petitioner's trial. After the post-conviction hearing, a written stipulation was filed. The stipulation was signed by Knox County Sheriff's Office Deputy Tylenia Miller. The stipulation stated

-17-

that Deputy Miller would testify that she was the courtroom officer during the Petitioner's trial and that a stun belt had been placed on the Petitioner's leg prior to trial at the request of trial counsel. The stipulation further stated that the stun belt was used because trial counsel "was afraid of" the Petitioner.

## V. Remand Hearing

Deputy Miller testified she was the courtroom officer for the Petitioner's trial and present in the courtroom throughout the trial. Deputy Miller testified that the decision to use a stun belt began "back in the judge's chambers" with trial counsel stating that the Petitioner had been "a problem . . . the night before," had threatened trial counsel, and "just kind of raised Cain."[4] According to Deputy Miller, trial counsel said that he "was scared and he was afraid [the Petitioner] was going to act up in the courtroom." Deputy Miller testified that this had surprised her because she "had never had any problems with" the Petitioner. According to Deputy Miller, trial counsel asked to go back to the holding area and speak to the Petitioner. Deputy Miller testified that when trial counsel returned, he stated that the Petitioner would not "get dressed and come out."

Deputy Miller testified that she went back to the holding area to talk to the Petitioner. She told the Petitioner that if he wanted to speak to the judge, he needed to come out into the courtroom and do it "on the record." Deputy Miller testified that the Petitioner came out and told the judge that he wanted trial counsel "off his case." Deputy Miller recalled that the Petitioner addressed the trial court "in a respectful manner," that he did not do anything "threatening or disruptive in court," and that the Petitioner's behavior was consistent with how he had acted in the past. According to Deputy Miller, after speaking with the judge, the Petitioner "decided to come back in the jail dock and get dressed out."

According to Deputy Miller, trial counsel "was still upset that [the Petitioner] was going to act out and cause a scene." Deputy Miller testified that before the Petitioner could be brought out "in his street clothes," trial counsel approached the bench and asked the trial court if there was anything it could do because he "had a problem with [the Petitioner] last night." Deputy Miller testified that, at that point, she "spoke up" and suggested the stun belt. Deputy Miller recalled that court services did not have a stun belt at that time but that there was one at the jail. Deputy Miller testified that she spoke to her supervisor and that he called the jail to arrange the use of the stun belt. Someone from the jail brought the stun belt to her supervisor, and her supervisor brought it up to the Petitioner's holding cell.

---

[4] Deputy Miller's recollection of the events leading up to the decision to place a stun belt on the Petitioner differs from what was recorded in the trial record.

-18-

Deputy Miller testified that the stun belt "was a waist belt" that "fits around the lower part of your back" and "under the clothes." Deputy Miller testified that her supervisor laid the stun belt "down on the floor and demonstrate[d] it" for the Petitioner. Deputy Miller recalled her supervisor telling the Petitioner the following:

> [I]f you act up and they tell you to calm down or sit down or be quiet and they have to tell you more than two times, this is going to go off, you'll hear a beep, beep, beep, and that means you're pressing the button and then the shock belt goes off.

Deputy Miller testified that the stun belt operated "like [a] stun gun" and that "it just paralyzes your muscles, tenses them up, and it brings [the wearer] into compliance."

Deputy Miller testified that her supervisor put the stun belt on the Petitioner and that the Petitioner then put on his "street clothes." Deputy Miller recalled that on the days the Petitioner wore the stun belt, an officer from the jail was in the courtroom with "the remote" used to activate the belt. According to Deputy Miller, the officer sat along the wall about ten to fifteen feet from where the Petitioner was. Deputy Miller testified that throughout the trial she "never had a problem" with the Petitioner. According to Deputy Miller, on the third day of the Petitioner's trial, before he had testified, she received a phone call from the jail requesting that the stun belt be returned. Deputy Miller testified that she did not think the stun belt was needed and sent it back to the jail.

Deputy Miller testified that she told the Petitioner before the third day of trial started that he would not be wearing the stun belt that day because "we've not had a problem." Deputy Miller recalled that throughout the trial, the Petitioner was "just quiet and cooperative." Deputy Miller stated that the Petitioner did not act any differently without the stun belt. Also, Deputy Miller specifically testified that she could not recall the Petitioner's acting any differently during his testimony.

The Petitioner testified that he was eighteen years old at the time of his trial. The Petitioner testified that "the first time that [he] had a complaint and [he] spoke up about anything . . . [he] was put in" the stun belt. Contrary to his testimony at the original post-conviction hearing that he never spoke to trial counsel about the stun belt, the Petitioner claimed at the remand hearing that he complained to trial counsel about the stun belt. The Petitioner claimed that he told trial counsel that he "didn't feel [the stun belt] was necessary because [they] had exchanged words, but [trial counsel] seemed to the contrary."

The Petitioner testified that he was told that he would be shocked for "[l]oud behavior" and "if they perceived [him] as unruly or aggressive." The Petitioner further testified that the only "standard" he was given about what would cause the stun belt to be

-19-

activated was just "don't act up." The Petitioner claimed that he was told that the stun belt "would shock [him] and it would incapacitate [him]" and that he "would probably lose a few [bodily] functions." The Petitioner testified that he did not remember being told he would be given two warnings before the stun belt was activated. The Petitioner made the following statement about the stun belt's effect on him during trial:

> I mean, that's all I thought about. It was bad enough what I was charged with, why I was in here. Then on top of it, I have a box strapped to me, I move wrong or I'm perceived as a threat or aggressive, you shock me, I'm already looked at as a monster as it is, you know, and you shock me, I flop on the floor like a fish, you know.

The Petitioner claimed that during the State's direct examination of Ms. Thompson, he leaned over to trial counsel and told trial counsel, "[T]here's no way she could have seen what she's claiming she saw, you know, she's giving descriptions of day and night of a vehicle and she's describing something that physically couldn't happen." The Petitioner clarified that Ms. Thompson had testified that Ms. Hoffman's car "was a two tone beige and a dark colored car" when the car was actually blue. The Petitioner testified that he pointed this out because he thought it was an important discrepancy and could be used to attack Ms. Thompson's credibility. The Petitioner further testified that he wanted to impeach Ms. Thompson's credibility because her testimony "was indicative of premeditation."

The Petitioner claimed that when he tried to speak to trial counsel about Ms. Thompson's testimony, trial counsel "got loud" and started telling him to "be quiet" and that he could not "hear the witness." The Petitioner further claimed that, in rebuking him, trial counsel was so loud that he "drew the attention of the jury," "the prosecution table," and the "spectators in the courtroom." The Petitioner testified that "it seemed like [trial counsel] purposely drew attention from the individual who had the [stun belt control] device in the courtroom." The Petitioner claimed that trial counsel's outburst caused the officer with the activation device to stare at him.

The Petitioner testified that after that incident, he "wasn't even willing to find out if [he] was going to be perceived as threatening or unruly" and that he "didn't even want to lean over and aid [his] lawyer fully." The Petitioner claimed that the officer "kept looking at" him through the remainder of the trial and that it affected his ability to confer with trial counsel. The Petitioner testified about how he felt after the incident as follows:

> I felt helpless. I felt like I was told to be a good slave and, you know, sit down, shut up, be quiet, you know, we're going to do what we're going to do, we're going to rush you out of here and, you know, we're going to get some TV time off of it and you're going to go on to the penitentiary.

-20-

The Petitioner claimed that at the start of his trial, he "had no intention [of] testifying because [he] was not properly prepared for any type of testimony." The Petitioner further claimed that he argued with trial counsel about not wanting to testify but that trial counsel told him he had "no choice." Contrary to Deputy Miller's testimony, the Petitioner claimed that he had the stun belt on when he testified and that having the "box on [him]" influenced his decision to testify. The Petitioner further claimed that the stun belt did not go around his waist but "was more of a box that was strapped around [his] inner thigh." The Petitioner recalled that his pants were "so fitting" that he thought the jury would see the stun belt and that he was afraid that it would "slide down [his] leg" as he walked to the witness stand.

The Petitioner reiterated that he "didn't want to [testify] to begin with" but that trial counsel called him to testify anyway. The Petitioner claimed that trial counsel told him to "agree with a lot" of what the prosecutor said and that he did so because he "had this box on [him], so . . . [he was] not going to be unruly," "show any aggression," or "show [his] dissatisfaction with taking the stand." The Petitioner further claimed that he agreed with the prosecutor regardless of whether it was true or not. With regards to how the stun belt influenced his testimony, the Petitioner stated as follows:

> I wasn't going to refute nothing [sic.] that the judge said, the prosecutor said, or my attorney for that matter. You know, of course, I'm going to dispute and tell the jury, you know, look, hey, people are lying, I'm being real though, but I was scared to say anything.

When asked for specific examples of things he agreed with the prosecutor about due to the stun belt being on him, the Petitioner first stated that he had lied when he testified that his friends did not help him dispose of Ms. Hoffman's car. However, it was noted that he was actually asked that during trial counsel's direct examination. The Petitioner also claimed that having the stun belt on caused him to testify that he remembered seeing Ms. Thompson after the murders when "in all honesty [he] never remember[ed] seeing" her. The Petitioner explained that he was "nervous and rushing through" his testimony and agreed to the prosecutor's question when it "never happened."

The Petitioner additionally claimed that he denied making numerous phone calls when he was confronted with the phone records on cross-examination because he had "the box on" him and did not "know what to do." The Petitioner testified that while he denied making the phone calls, he did so "under duress[,] being scared, [and] . . . try[ing] to rush through it." The Petitioner also testified that he wanted to point out the discrepancy between Mr. Wilson's trial testimony and his statement to the police about where the Petitioner's shoes were located. The Petitioner claimed that he did not because he "wasn't going to speak out of turn and be perceived as unruly or aggressive." The

-21-

Petitioner also claimed that he was never given Mr. Wilson's statement to the police and that he only knew about the discrepancy because trial counsel told him about it. However, the Petitioner admitted that he testified at the previous post-conviction hearing that he had received and reviewed Mr. Wilson's statement.

The Petitioner testified that other than the specific examples he had pointed out, his testimony at trial was truthful. The Petitioner admitted that he had testified at the previous post-conviction hearing that his trial testimony was truthful and that he did not agree with everything the prosecutor asked him during cross-examination. The Petitioner testified that when he testified that Mr. Nance was the one to pull a gun on him, not Ms. Hoffman, it was the truth. The Petitioner also admitted that his testimony about the actual murders was truthful despite his claim that he was wearing the stun belt. The Petitioner claimed that he was forced to wear the stun belt until the day after he testified. The Petitioner further claimed that he was still afraid of the stun belt even when he was not wearing it because he "wasn't told it wouldn't be put back on."

At the conclusion of the hearing, the post-conviction court orally announced the dismissal of the petition. The post-conviction court found that "[a] more thorough inquiry should have been made and it should have been made on the record" before the stun belt was placed on the Petitioner. The post-conviction court further found that, "under the circumstances here, trial counsel was deficient in failing to get this on the record and show the reasons why the stun belt might be needed." In addressing whether the stun belt had an adverse effect on the Petitioner's demeanor or his ability to testify at trial, the post-conviction court stated that it was the Petitioner's burden "to prove by clear and convincing evidence" that the stun belt had such an effect.

The post-conviction court then found that "arguably[,] the stun belt might have had an adverse effect on [the Petitioner's] ability to insist on not testifying at trial[,] [b]ut this court cannot find . . . that the stun belt itself had an adverse effect on his ability to testify." The post-conviction court found that the Petitioner took the stand and "testified freely, he agreed with the cross-examination at times, he disagreed with it at times," but "he told the jury the truth about the incident and the stun belt did not prevent him from doing that." The post-conviction court also accredited Deputy Miller's testimony over the Petitioner's and found that the Petitioner was "unable to show by clear and convincing evidence that he even had the stun belt on at the time he testified."

With respect to the Petitioner's claims that he lied and just agreed with the prosecutor during specific parts of the cross-examination, the post-conviction court found that the Petitioner "partly" attributed that to the stun belt and to "his lawyer's advice to be agreeable with the" prosecutor. The post-conviction court concluded that there was "no evidence, really, that he wanted to testify in a way other than the way he did testify and that he did so because of the belt." The post-conviction court stated that it could not

"make a finding that the [Petitioner] has established by clear and convincing evidence that having the stun belt on at trial had an adverse effect on his ability to testify." The post-conviction court then determined that the Petitioner had "not shown, demonstrated, or proved by clear and convincing evidence that any adverse effect occurred and certainly not sufficient adverse effect to undermine confidence in the outcome of . . . trial."

## ANALYSIS

The Petitioner contends that he received ineffective assistance of counsel when his trial counsel allowed a stun belt to be placed on him without a hearing or any evidence from the State that use of the stun belt served a legitimate necessity. At the outset, the Petitioner argues that the post-conviction court applied the wrong standard of review in assessing whether he was prejudiced by trial counsel's deficient performance regarding the stun belt. The Petitioner further argues that the stun belt, or a fear of having the stun belt placed back on him, forced him to testify against his will, violating his constitutional right against self-incrimination and altering his demeanor while testifying, both to the prejudice of his defense. The Petitioner also argues that his defense was prejudiced by the stun belt's having "chilled" his ability to effectively communicate with trial counsel and "impaired his ability to take an active interest in the presentation of his case."[5]

The State responds that the post-conviction court did not use the wrong standard of review. Rather, the State argues, the post-conviction court "inarticulately stated the standard of review." The State further responds that "there is no showing that the [P]etitioner was forced to testify at trial" and that his "testimony would not have been different in any significant way without the use of the [stun] belt." The State also responds that the Petitioner's claim "that he was unable to fully communicate with [trial] counsel . . . . is not supported in [the] record."

### I. Standard of Review

Post-conviction relief is available when a "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel. Dellinger v. State, 279 S.W.3d 282, 293 (Tenn. 2009) (citing U.S. Const.

---

[5] In his brief, the Petitioner argues these as two separate issues. In support of his first claim, the brief cites to the Petitioner's testimony regarding the alleged incident that took place during Ms. Thompson's testimony. In arguing the second claim, the brief cites to further testimony from the Petitioner about how the stun belt impaired his ability to communicate with trial counsel and the Petitioner's claims about how the stun belt affected his testimony during cross-examination. In the interest of brevity and clarity, we will address the Petitioner's factual allegations supporting the second claim in our discussion of the effect the stun belt had on his ability to communicate with trial counsel and his demeanor while testifying.

amend. VI; Cuyler v. Sullivan, 446 U.S. 335, 344 (1980)). When a claim of ineffective assistance of counsel is made under the Sixth Amendment to the United States Constitution, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993).

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness," despite the fact that reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 688-89. Prejudice requires proof of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); see Dellinger, 279 S.W.3d at 293-94. On appeal, we are bound by the post-conviction court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. Id. Because they relate to mixed questions of law and fact, we review the post-conviction court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457.

A petitioner's burden to prove his allegations of fact by clear and convincing evidence and the Strickland analysis are two separate inquires. Dellinger, 279 S.W.3d at 293. As such, a post-conviction petitioner is required to first "prove the fact of counsel's alleged error by clear and convincing evidence," and if that burden is met, the post-conviction court is then required to perform the Strickland analysis. Id. at 294; see also Thomas T. Nicholson v. State, No. E2009-00213-CCA-R3-PC, 2010 WL 1980190, at *22-23 (Tenn. Crim. App. May 12, 2010) (noting our supreme court's recent clarification of "the correct standard for evaluating a post-conviction claim of ineffective assistance of counsel"). However, the distinction that the clear and convincing evidence standard applies only to a petitioner's allegations of fact and not to the Strickland analysis is one that is sometimes overlooked.

Typically, statements that a petitioner has the burden to prove or failed to prove deficiency or prejudice by clear and convincing evidence are viewed as merely imprecise rather than a misapplication of the law when the correct standard is referenced earlier in the decision. See Dellinger, 279 S.W.3d at 294; Fields, 40 S.W.3d at 458. Here, the post-conviction court's application of the standard of review was blurred by this case's complex procedural history. The post-conviction court was asked to examine the Petitioner's factual allegations regarding the stun belt after this court and our supreme court had already determined trial counsel's actions regarding the stun belt to be deficient.[6] Mobley, 397 S.W.3d at 102-103; Mobley, 2011 WL 3652535, at *15. Yet, in orally dismissing the petition, the post-conviction court made no mention of the appropriate standard of review and repeatedly stated that the burden was on the Petitioner to prove by clear and convincing evidence the adverse effect of the stun belt on his testimony and the outcome of his trial. However, following our de novo review, we affirm the post-conviction court's dismissal of the petition.

## II. Stun Belt and the Petitioner's Testimony

In remanding this case to the post-conviction court, our supreme court instructed it to specifically examine "whether requiring [the Petitioner] to wear a stun belt at trial had an adverse effect on his demeanor or his ability to testify at trial."[7] Mobley, 397 S.W.3d at 103 (emphasis added). However, the crux of the Petitioner's argument on appeal is that wearing the stun belt forced him to waive his constitutional right against self-incrimination rather than addressing its effect on his demeanor and testimony at trial. The Petitioner has twice unsuccessfully argued that other factors caused him to waive his right against self-incrimination and forced him to testify at trial: on direct appeal, the Petitioner claimed that the initial exclusion of Dr. Auble's testimony did so, and in his original post-conviction appeal, the Petitioner raised a similar claim that trial counsel failed to prepare him to testify, called him to testify against his will, and failed to ensure that his decision was voluntary. Mobley, 397 S.W.3d at 88-91; Mobley, 2007 WL 1670195, at *12-14. Given that the majority of the Petitioner's argument on appeal is focused on the self-incrimination issue, we will address the issue despite the fact that this claim has twice been rejected in other contexts and is not the issue our supreme court directed the post-conviction court to examine on remand.

---

[6] We respectfully decline the State's invitation in its brief to conclude that trial counsel's performance was not deficient because use of the stun belt was necessary and warranted and to ignore the decisions of a separate panel of this court, our supreme court, and the post-conviction court on remand that trial counsel was deficient in allowing the stun belt to be placed on the Petitioner.

[7] The Petitioner's argument in his original post-conviction appeal focused on the effect the stun belt had on his mental faculties and demeanor while testifying, alleging that it impeded his constitutional right to testify. Here, the Petitioner alleges the converse, that the stun belt caused him to waive his right against self-incrimination and forced him to testify at trial.

*A. Actual Use of the Stun Belt*

With respect to the Petitioner's claims that he was wearing the stun belt when he elected to testify and while testifying, the Petitioner failed to prove these factual allegations by clear and convincing evidence. The post-conviction court accredited Deputy Miller's testimony that the stun belt was not placed on the Petitioner on the third day of his trial, the day he testified, over the Petitioner's testimony to the contrary. The evidence in the record does not preponderate against those findings, especially in light of other inconsistencies in the Petitioner's testimony regarding the stun belt. The Petitioner repeatedly testified that the belt was "a box" strapped around his thigh. However, Deputy Miller testified that the belt "was a waist belt" fitting around "the lower part" of a person's back. Likewise, our supreme court noted that the Petitioner's "description of the stun belt as attaching to his thigh distinguishes it from those most often described in case law." Mobley, 397 S.W.3d at 97 n.19. Similarly, the Petitioner testified that an unidentified man dressed all in black demonstrated the device and did not tell him he would be warned before it was activated. Deputy Miller testified that one of her supervisors from the Knox County Sheriff's Office demonstrated the belt and told the Petitioner he would receive two warnings before it was activated.

*B. Fear of the Stun Belt*

The Petitioner argues, in the alternative, that even without the stun belt on, his fear of having it placed back on him caused him to waive his right against self-incrimination and affected his demeanor while testifying. We disagree with the post-conviction court's finding that the stun belt "might have had an adverse effect on [the Petitioner's] ability to insist on not testifying at trial." The record clearly establishes that the Petitioner voluntarily chose to exercise his constitutional right to testify in his own defense. The Petitioner testified at the remand hearing that he did not want to testify "to begin with" and, to corroborate his testimony, points in his appellate brief to his statement before trial that there was "no way" he could "take the stand." However, prior to making that statement, the Petitioner had complained that trial counsel had failed to visit him, return his phone calls, or disclose to him the theory of defense.

The Petitioner's entire statement to the trial court was as follows: "So I just can't -- there's no way I would be able to attend this trial today or take the stand in this case as long as I'm forced to go to trial with this man." Contrary to the Petitioner's assertion, his statement to the trial court evidences that he had contemplated testifying in his own defense but that he did not trust trial counsel to shepherd him through his testimony. In discussing the Petitioner's complaints with the trial court, trial counsel stated that he had met with the Petitioner the previous Friday and had specifically discussed the Petitioner's expected testimony at trial. Additionally, in informing the Petitioner of the rights he would be forfeiting if he was tried in absentia, the trial court explained to the

Petitioner that he had the right to testify, as well as the converse right to remain silent and that the decision was "completely" his.[8] Immediately before the Petitioner testified, the trial court again stated that the Petitioner did "not have to testify if he [did not] want to" and that "no one [could] force [the Petitioner] to testify."

At the original post-conviction hearing, a letter from trial counsel to the Petitioner dated approximately two weeks before the trial began was introduced into evidence. The letter reviewed the facts of the case as the Petitioner had told them to trial counsel, specifically, that the Petitioner had acted in self-defense after being threatened by the victims. The letter also stated that they had "discussed" the fact that the Petitioner did "not have to testify in this case," but trial counsel advised the Petitioner that he was "the only person who [could] explain what happened[ and] why." Trial counsel testified at the hearing that he recalled that he reviewed with the Petitioner what the Petitioner's testimony would be "if he testified at trial." Trial counsel also testified that he left the decision whether to testify up to the Petitioner.

Importantly, at the original post-conviction hearing, the Petitioner made no mention of the stun belt in explaining his decision to testify. Rather, the Petitioner claimed that he decided to testify because trial counsel told him that the trial would end immediately and that he would "automatically be found guilty" if he did not testify. Later, when the Petitioner was asked about the stun belt, the Petitioner said that the stun belt "and a lot of other things" had "interfered with [his] ability to testify." The Petitioner was never asked at the original post-conviction hearing if the stun belt influenced his decision to testify at trial, and the Petitioner did not testify to that effect. At the remand hearing, Deputy Miller testified that when she informed the Petitioner that he would not be wearing the stun belt on the third day of his trial, she told the Petitioner that it was because they had "not had a problem." Based on the foregoing, we conclude that the Petitioner failed to establish by clear and convincing evidence that fear of the stun belt being placed back on him forced him to testify at trial.

Additionally, as previously stated above, a panel of this court rejected a similar claim when the Petitioner alleged on direct appeal that he was forced to testify in violation of his right against self-incrimination when the trial court initially excluded Dr. Auble's testimony. Mobley, 2007 WL 1670195 at *14. In so holding, the panel stated that there was nothing in the trial record "to indicate that the [Petitioner] ever expressed reservation about testifying, or that he testified only because Dr. Auble's proposed

---

[8] At the original post-conviction hearing, the Petitioner testified that he was wearing the stun belt when he told the trial court that he wanted to be present for his trial. At the remand hearing, Deputy Miller testified that the stun belt was placed on the Petitioner just before he put on his "street clothes." The trial record is clear that the Petitioner was in his jail uniform when he informed the trial court that he wanted to proceed with his trial.

testimony had initially been excluded." Id. Similarly, in rejecting the Petitioner's claim about trial counsel's handling of his testimony, our supreme court concluded that "the record contain[ed] ample evidence supporting the post-conviction court's finding" that trial counsel had prepared the Petitioner to testify at trial. Mobley, 397 S.W.3d at 89. Our supreme court further held that "the trial record plainly demonstrate[d] that [the Petitioner] was advised on multiple occasions that he could choose to testify or not testify." Id. at 91.

With respect to the Petitioner's claim that his fear of the stun belt being placed back on him affected his demeanor while testifying, the Petitioner also failed to prove that factual allegation by clear and convincing evidence. To begin, Deputy Miller testified at the remand hearing that she could not recall the Petitioner's acting any differently during his testimony than he did throughout the trial. The Petitioner's chief complaint during his testimony at the remand hearing was that his fear of the stun belt caused him to be complacent and agree to everything the prosecutor asked him. The record clearly belies this assertion and demonstrates numerous instances where the Petitioner disagreed, at times definitely so, with the prosecutor during her cross-examination. Of those numerous denials, the Petitioner denied making several phone calls to Mr. Nance from the Petitioner's mother's cell phone. At the remand hearing, the Petitioner claimed that his fear of the stun belt caused him to make those denials. However, the denials were consistent with the Petitioner's claim of self-defense, that Mr. Nance had called him to arrange the meeting and threatened him over some money he owed Mr. Nance.

With respect to the Petitioner's claim that he was too afraid to point out the discrepancy between Mr. Wilson's testimony and his statement to the police regarding the Petitioner's shoes, the Petitioner denied on cross-examination that he threw the shoes away and claimed it was actually another friend, Brandon Walden, who had thrown them away. As for the Petitioner's claim that he lied when he testified that he remembered seeing Ms. Thompson, there was ample evidence to support Ms. Thompson's claim that she saw the Petitioner. Ms. Thompson testified that she knew the Petitioner, heard tires squealing, saw the Petitioner driving away in Ms. Hoffman's car, ran to where she had seen the Petitioner driving away from, and discovered Ms. Hoffman's body and the murder weapon, which was ultimately revealed to have one of the Petitioner's fingerprints on it. Based on the foregoing, we conclude that the Petitioner has failed to establish by clear and convincing evidence his factual allegation that his fear of the stun belt affected his demeanor while testifying.

Furthermore, the Petitioner has failed to establish that he was prejudiced by his testimony at trial. The Petitioner contends that his decision to testify was "devastating" because his testimony contradicted what he told Dr. Auble, "that it was Ms. Hoffman

-28-

who pulled the gun on him." The Petitioner further contends that he was prejudiced because he testified that he did not realize Mr. Nance was still in the car when he drove away. The Petitioner argues that his testimony was particularly damning because "the proof of premeditation was only 'weakly supported.'" However, the Petitioner testified at the original post-conviction hearing that all of his testimony at trial was truthful. At the remand hearing, the Petitioner alleged that portions of his trial testimony had been untruthful but stated that his testimony about the actual murders was truthful despite his claim that he was wearing the stun belt.

With respect to his argument that his testimony was "devastating" because it contradicted what he had previously told Dr. Auble, we note that Mr. Wilson testified during the State's case in chief that the Petitioner told his friends that Mr. Nance, not Ms. Hoffman, had pulled a gun out. Therefore, the Petitioner's contradictory claim that it was Mr. Nance, not Ms. Hoffman, who had the gun, would have been presented to the jury regardless of whether he testified at trial. As for the Petitioner's testimony that he did not realize Mr. Nance was still in the car, it was consistent with his overall claim of self-defense. The Petitioner claimed that he was threatened by and afraid of Mr. Nance. The Petitioner testified that he "reacted" when Mr. Nance pulled a gun, and he shot Mr. Nance and Ms. Hoffman. The Petitioner then claimed that he continued to react, dropping the gun beside Ms. Hoffman's body, not paying any attention to whether he ran over her body, and driving away quickly in a state of surprise and shock. The Petitioner's testimony about not realizing Mr. Nance was in the car was consistent with his other claims.

Additionally, the record belies the Petitioner's claim that "the proof of premeditation was 'only weakly supported.'" As our supreme court noted in the Petitioner's original post-conviction appeal, "the record contains ample evidence from which a jury could find premeditation." Mobley, 397 S.W.3d at 88. Specifically, "the record contains proof from which a jury could conclude that [the Petitioner] called Mr. Nance to arrange a meeting, brought a gun to the meeting, shot the victims in the head at close range, exhibited calmness after the shooting, and attempted to dispose of evidence of the shooting." Id. There was significant evidence regarding the Petitioner's calmness after the killings from Ms. Robinson, Mr. Wilson, and Ms. Byrge. Additionally, there was significant evidence regarding the Petitioner's attempts to dispose of the evidence, including the fact that he set Ms. Hoffman's car on fire. The Petitioner also attempted to flee when the police arrived to arrest him.

As such, the Petitioner failed to establish a reasonable probability that, but for his testimony, the result of the proceeding would have been different. See Grimes v. Mills, No. 09-901-PK, 2010 WL 5638107, at *5 (D. Or. Nov. 23, 2010) (finding no prejudice where the petitioner "was relatively consistent in his account of events at trial both on

-29-

direct and cross[-]examination"); People v. Washington, No. D047417, 2006 WL 2507222, at *2 (Cal. Ct. App. Aug. 31, 2006) (finding stun belt had no effect on defendant's "demeanor or attention" while testifying when the defendant "was able to follow the questioning and his answers were direct and undistracted" and other evidence belied "the notion that he was nervous or distracted by the presence of the belt").

## C. Fifth Amendment Claim

To the extent that the Petitioner also raises a Fifth Amendment claim regarding the alleged violation of his right against self-incrimination independent from his ineffective assistance of counsel claim, we note that a "defendant who chooses to testify waives his privilege against compulsory self-incrimination with respect to the testimony he gives." Harrison v. United States, 392 U.S. 219, 222 (1968). "[A] necessary element of compulsory self-incrimination is some kind of compulsion." Hoffa v. United States, 385 U.S. 293, 304 (1966). Here, the Petitioner has failed to show that the stun belt compelled him to testify against his will. In fact, the Petitioner did not raise such an argument until the remand hearing. Prior to that, the Petitioner had argued that the stun belt had actually impeded his right to testify. The evidence supports trial counsel's testimony that the Petitioner chose to testify in order to establish his claim of self-defense because the facts against him were so "compelling." It has long been recognized that the waiver of the right against self-incrimination "is no less effective or complete because the defendant may have been motivated to take the witness stand in the first place only by reason of the strength of the lawful evidence adduced against him." Harrison, 392 U.S. at 222. Accordingly, we conclude that this issue is without merit.

## III. Communication with Counsel and "Interest in the Presentation of His Case"

The evidence at the remand hearing established that the Petitioner had been placed in a stun belt for the first two days of his trial. In the Petitioner's original post-conviction appeal, our supreme court held that "the use of a stun belt implicates many of the same principles as the use of shackles." Mobley, 397 S.W.3d at 101. As such, the supreme court concluded that the same "principles and procedures" used to determine whether the use of visible restraints are warranted should be used in determining whether a stun belt should be used on a defendant. Id. "[T]here is a legal presumption against the use of in-court restraints," and "the State bears the burden of demonstrating necessity that serves a legitimate interest, such as preventing escape, protecting those present in the courtroom, or maintaining order during trial." Id. Additionally, the "trial court must make particularized findings" with "the better practice" being to hold a hearing on the issue. Id. Given this, our supreme court concluded that trial counsel's "agreeing to the suggestion of using a stun belt without discussing the matter with [the Petitioner] was not within the range of competence demanded of [the Petitioner's] trial counsel." Id. at 102. On remand, the post-conviction court also found trial counsel to be deficient in this

-30-

regard. Therefore, our review is limited to the question of whether the Petitioner was prejudiced by trial counsel's deficiency.

The Petitioner alleges that during the first two days of his trial, he was prejudiced by not being able to effectively communicate with his counsel, specifically regarding Ms. Thompson and Mr. Wilson's testimonies, and was unable "to take an active interest in the presentation of his case." However, the Petitioner failed to establish the factual allegations of these claims by clear and convincing evidence. Trial counsel testified at the original post-conviction hearing that "once the trial got started, [the Petitioner] was just like he'd always been, there weren't any problems." Trial counsel additionally testified that the Petitioner "paid close attention" throughout the trial. Deputy Miller testified that there were no problems with the Petitioner during the trial and that he acted the same with the stun belt on as he did with it off. Ms. Hoffman's father testified that, during the trial, the Petitioner repeatedly winked at him and said, "Watcha gonna do." The Petitioner himself testified at his sentencing hearing that he and trial counsel "talked about this case quite a bit."

The Petitioner claims that during Ms. Thompson's testimony, he leaned over to tell trial counsel that Ms. Thompson had testified that Ms. Hoffman's car was the wrong color and that trial counsel chastised him so loudly it drew the attention of the prosecutors, the jurors, the spectators, and the officer with the stun belt activation device. However, no such outburst is found in the trial record, and trial counsel testified that he did not recall the Petitioner's ever trying to speak to him during any of the witnesses' testimony or telling the Petitioner to stop talking during the testimony of any of the witnesses. Ultimately, trial counsel did not attempt to impeach Ms. Thompson about her misidentification of the color of Ms. Hoffman's car. However, the Petitioner has not established that he was prejudiced by trial counsel's failure to impeach Ms. Thompson regarding the color of the car.

Ms. Thompson testified that she knew Ms. Hoffman and the Petitioner, that she was familiar with Ms. Hoffman's car, and that after hearing squealing tires she saw the Petitioner driving away in Ms. Hoffman's car. Ms. Thompson testified that the Petitioner waived at her and then started adjusting the radio. Ms. Thompson's testimony is corroborated by the fact that she discovered Ms. Hoffman's body and the murder weapon after running to where she had seen the Petitioner come from. Furthermore, the Petitioner admitted at trial that Ms. Thompson saw him as he was driving away. Even if we were to find Ms. Thompson's testimony completely incredible based solely on her misidentification of the color of the car, the Petitioner admitted to killing the victims and driving away in Ms. Hoffman's car. Ms. Robinson and Mr. Wilson both testified to seeing the Petitioner drive Ms. Hoffman's car that day. Additionally, Ms. Thompson was not the only witness to provide evidence that the Petitioner was calm after the killings.

Ms. Robinson, Mr. Wilson, and Ms. Byrge all testified as to the Petitioner's calmness after the murders. As such, the Petitioner has not established that he was prejudiced regarding Ms. Thompson's testimony.

The Petitioner also claims that he was unable, due to his fear of the stun belt, to inform trial counsel of a discrepancy between Mr. Wilson's trial testimony and his statement to the police. However, trial counsel testified that he had given the Petitioner all of the witness statements prior to trial and had reviewed and discussed them with the Petitioner. The Petitioner testified as such at the original post-conviction hearing, but he claimed at the remand hearing that he had never been given Mr. Wilson's statement and only knew about it because trial counsel had told him about it. However, under either scenario, the facts establish that the Petitioner and trial counsel discussed Mr. Wilson's statement to the police. Therefore, the Petitioner failed to prove the factual allegations of this claim by clear and convincing evidence.

Mr. Wilson initially testified that the Petitioner had thrown the shoes away in a garbage can in the motel room. However, on cross-examination by trial counsel, Mr. Wilson changed his testimony to allege that the Petitioner had placed the shoes in a garbage bag, tied the bag shut, and placed it on a table. The Petitioner, during his testimony, denied throwing away his shoes and claimed that a different friend who did not testify at trial, Brandon Walden, had done it for him. Furthermore, as with Ms. Thompson's testimony, even if we were to assume that Mr. Wilson's testimony was completely incredible based on the issue of the shoes, there was ample evidence that the Petitioner had attempted to destroy other evidence. Mr. Wilson's testimony regarding the money he saw the Petitioner with was corroborated by Ms. Robinson, and the Petitioner admitted to setting Ms. Hoffman's car on fire.

Accordingly, we conclude that the Petitioner has failed to establish a reasonable probability that, but for trial counsel's error in allowing him to be placed in a stun belt, the result of the proceeding would have been different. See United States v. Miller, 531 F.3d 340, 347 (6th Cir. 2008) (finding no prejudice when there was "no evidence in the record to contradict the attorney's account that [the defendant] was able to confer with counsel at trial"); Porter v. Terhune, No. CV 00-5468 NM (AJW), 2006 WL 4711856, at *18-20 (C.D. Cal. Apr. 17, 2006) (acknowledging that use of a stun belt "may impair the defendant's ability to think clearly, concentrate on trial testimony, communicate with counsel at trial, and maintain a positive appearance before the jury," but finding no prejudice when the court accredited the testimony of witnesses that the "petitioner's demeanor was the same with and without" the stun belt and that the petitioner's allegation that he could not discuss with his attorney about the decision to testify at trial was "undermined by the record"); cf. Gonzalez v. Piller, 395 Fed. App'x. 453, 457 (9th Cir. 2010) (finding prejudice where a defendant had been told that he would be shocked

if he communicated "with persons in his immediate vicinity" and such warning caused him to refrain from communicating with his attorney during the trial).

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE